In re ALBION DISPOSAL, INC., Debtor.

In re I & J DISPOSAL OF WESTERN NEW YORK, INC., Debtor.

In re J & I DISPOSAL, INC., Debtor.

In re 11372 MAIN STREET, INC., Debtor.

In re ORLEANS SANITARY LANDFILL, INC., Debtor.

Craig A. SLATER, as Trustee of Albion Disposal, Inc., I & J Disposal of Western New York, Inc., J & I Disposal, Inc., 11372 Main Street, Inc., and Orleans Sanitary Landfill, Inc., Plaintiffs,

v.

John M. SMITH and Irene M. Smith, SSWS, Inc., Defendants.

Bankruptcy Nos. 91–12805 M to 91–12807 M, 91–12889 M and 91–12878 M.
Adv. No. 91–1333 K.

United States Bankruptcy Court, W.D. New York.

March 18, 1993.

Jack L. Getman, Goldman, Costa, Getman & Biryla, Raymond L. Fink, Saperston & Day, P.C., Buffalo, NY, for trustee Craig A. Slater.

John J. Hurley, Paul K. Stecker, Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, NY, for SSWS, Inc.

Carl L. Bucki, Cohen, Swados, Wright, Hanifen, Bradford & Brett, Buffalo, NY, for John Smith.

## PART ONE. INTRODUCTION

MICHAEL J. KAPLAN, Chief Judge.

In August of 1991, these Debtor corporations filed for relief under Chapter 11 of the Bankruptcy Code claiming millions of dollars of debt. Shortly thereafter, bidders amassed seeking to acquire the Debtors' assets (principally a licensed sanitary landfill, trash hauling companies, and appurtenances) as well as lands titled in the names of John and Irene Smith. The corporate and private parcels, when combined as a single unit, were thought to be worth vastly more than the aggregate debts. The Smiths, husband and wife, founded these closely-held Debtor companies 25 years ago. When the companies were filed under the Bankruptcy Code, the Smiths let it be known that their interests in the adjacent lands could (on the right terms) be purchased along with the corporate assets. Vigorous efforts were undertaken by an informal committee of creditors and bidders to resolve "the right terms" with the Smiths as to their interests. On the eve of a "level-field" auction of the corporate assets in which the Smiths would be assured

their price, the Smiths secretly executed a lease of the Smith-titled lands to one of the creditor-bidders who was not a member of the informal "committee". The existence of the lease was then disclosed. Bidding for the corporate assets all but collapsed in light of the "lock" upon the adjacent lands. Expectations of full payment to creditors were dashed. This litigation results.

These are reciprocal motions for Summary Judgment upon certain Causes of Action contained within a Complaint by a Chapter 11 Trustee against an individual who owned and controlled the corporate debtors, his wife, and their grantee (hereinafter SSWS, Inc., SSWS, or lessee). The Complaint challenges many aspects of the Smiths' claim of exclusive ownership of real estate adjacent to these Debtor corporations' real estate and place of business, and it challenges the validity of the Smiths' post-petition leasing of their lands to SSWS.

To a limited extent, the factual situation before the Court is not unique, merely rare. But it is not surprising that the issues presented are not addressed in the reported cases because of three unique features, to be addressed shortly. Even so, the Court would have thought the governing principles in this multi-million dollar litigation to be obvious to those involved.

Some of the principles are:

1. A contract may be imputed from conduct.

2. The Statute of Frauds is a shield, not a sword.

3. A Chapter 11 Debtor's rights under an executory contract are "property of the estate," protected by the automatic stay of 11 U.S.C. § 362.

4. A Chapter 11 Debtor-in-Possession is a Trustee, as are its officers and directors.

5. A Trustee may not profit at the expense of his trust.

6. Those who confederate with a Trustee in breach of his trust are also liable for the breach.

These principles coalesce into the concept that if a corporate principal (in this case, a principal owner and controlling officer or director) causes the corporation (and its creditors) to spend $2.4 million in developing lands that included the principal's own lands as part of a very valuable project in which the corporation was to share, then when that principal files the corporation in Chapter 11, he may not deal freely for his own benefit in his land so improved, even if he "never got around" to granting to the corporation a recorded or recordable interest in those lands.[1] The governing principles further coalesce to establish that one who fully knows these facts, and who purchases rights to the land seeking to obtain an unfair advantage over others bidding for the bankrupt's assets, acquires *at most* an interest that is subject to the claims of the corporation's creditors.

Generically, the facts at bar are that the corporation possesses assets that are of limited value without the principals' assets, and vice versa, and the two together are worth a great deal. Bankruptcy Courts regularly see cases of this kind: instances in which the corporation owns unique manufacturing facilities and the principal owns the patent; the corporation owns the profitable operations and the principals own the land upon which they must be conducted (such as resort property); the corporation owns the name and the principals own everything else (or vice versa); etc.

The facts at bar are unique, however, in three ways. First, the relationship between the corporation and the principal here (which relationship constituted a landfill "project" worth tens of millions of dollars) was (according to the principal) never reduced to writing. Second, the principal, together with one among a number of highly solvent corporations interested in acquir-

---

1. In the terms used by the lessee in its Memorandum of Law: "The precise business relationship that would govern OSL's anticipated future use of the Smith Expansion Property was never finally resolved.... [S]ome agreement would be reached once the [expansion] permit was granted, ... [so] the Smiths and OSL never entered into any partnership, lease or other agreement...." because the permit had not yet been granted as of the date that Smith filed the corporation under Chapter 11. See SSWS's Memorandum filed December 4, 1992, at p. 7.

ing this project, decided to ignore large expenditures of corporate funds in developing the principal's "own lands," and brazen-out an argument that the corporation had no interest in the principal's lands, and thereby sought to "finesse" or preempt the bidding on the corporation's assets, to the predictable detriment of the corporation's creditors. And third, a mere constructive trust upon the profits unjustly made by the principal and/or his privies would be neither fully compensatory nor compatible with prior Orders of this Court that were entered under emergency circumstances and upon which another entity (WMNY, Inc.) has relied at great expense and in hopes of profit.

Consider, for example, the more typical case of the vacation resort that is operated by the corporation, but operates on land owned by the corporation's owners/directors. Inevitably the corporation would have some documented interest (*at least* a duly-executed license) upon the lands. If the principals placed the corporation in Chapter 11 and scheduled the bare license as the only interest of the debtor in that asset, the creditors would race to Court to preserve and protect that interest; to examine whether the corporation might have other legal or equitable claims upon the land; to enjoin the transfer of the land; and so forth.

What happened here is that nothing regarding the corporation's interest in the principal's land was (supposedly) ever executed, let alone recorded. Not even a bare license is admitted to have been granted. But after placing the corporation in Chapter 11 the principal and his wife (also a principal officer until at least 1986, and possibly thereafter) expressed a willingness in open court to place their interests in their lands on the auction block along with the corporate assets. The only question at that time was: For how much of the synergistic value of the combined assets would the Smiths settle? (Not just price, but also other value such as indemnities.) Then, instead of communicating that set of terms

to the amassing bidders and the Creditors' Committee, they secretly reached a price with SSWS and executed a lease of "their" lands to SSWS for $30,000 per month, plus $2,000,000 if SSWS obtained the OSL lands, plus further millions of dollars (potentially) in royalties for dumping (called "tonnage") upon either the Smith lands or the OSL lands.[2] The informal Creditors' Committee was presented with a fait accompli. Thereafter, all of the other potential bidders for the corporate assets walked away except one, who was willing to "bet" that this lease was unlawful, as discussed later.

What looked like certain full-payment to all creditors, plus enormous gain to the principals and great profit potential from a projected four-hundred million dollar 20–year revenue stream for the successful bidder, turned into a prospect of only partial payment to corporate creditors, and into an effort to obtain great rewards for those who had subverted the expectations that were based not only on ancient principles, but also on the representations of the principal and his wife to this Court.

Another Judge of this Court has previously ruled that such profiteering cannot stand and disapproved SSWS's bid for acquisition of the corporate assets.[3] Higher authority will determine whether the Court correctly rejected the bid for the corporate assets. The present Court is examining only the lease of the Smith-titled lands, not the bid for the corporate assets, and agrees that the lease is profiteering that cannot stand as against the corporate debtors' claims against those lands.

The Court will today explain that when a corporation's principal has refrained or neglected to grant the corporation a documented "property interest" in his own lands when he caused the corporation to make vast improvements in those lands and otherwise contributed his lands to a "project" for the mutual benefit of the principal and the corporation, the fact that he so refrained or neglected does not leave the corporation with no interest whatsoever in

---

**2.** The business is a sanitary landfill.

**3.** See Order of Hon. Beryl E. McGuire of April 24, 1992; Appeal pending.

the lands that can be protected by 11 U.S.C. § 362 or § 549 when he later places the corporation in Chapter 11. He may not make a post-petition conveyance of "his" lands that not only denies the corporation any value from "his" lands, but also conveys to the grantee the leverage to obtain corporate assets at a diminished price. The Trustee and Court need not define the nature of the corporation's interest in those lands, e.g. whether the principal's land is impressed with a constructive trust, an equitable lien, alter-ego liability, a lease, a license, an easement, an oral partnership or joint venture agreement, a co-tenancy, an expectancy, or future interest or any other specie of "estate" or "right" in the fiduciary's land.[4] In order to defeat the conveyance, it is sufficient under 11 U.S.C. § 541 that the corporation have a valuable "legal or equitable interest" in the property, no matter how intangible, inchoate, or incorporeal such interest is: That requirement is met where, as here, the debtor had contract rights that were unilaterally terminated by the Smiths by the act of leasing the land to SSWS.

After the corporation is placed under the protection of the Bankruptcy Court, the burden is upon the principal who wishes to profit from his own interests, but who failed or declined to define and disclose to creditors the extent of the corporation's interests (or alleged lack of interest) therein, to submit to the Bankruptcy Court the question of the extent of the Debtor's interest in "his" lands. He must at the very least disclose his intentions in a manner sufficient to provide to interested parties an opportunity to examine them and to petition the Court to maintain the status quo.

Failing to so disclose or submit, his purported transfer of an interest in his lands to the injury of the D–I–P is voidable under 11 U.S.C. § 362 (and possibly 11 U.S.C. § 549 as well) at least where, as here, the transferee had full knowledge of all salient facts.

Such transfer is also a violation of the *fiduciary duties* of an officer of a D–I–P, and for that reason as well is the transfer (by John Smith, at least) avoidable, where, as here, avoidance is the only remedy that is fully compensatory to the estate and is otherwise just: Breach of fiduciary duty is, thus, a distinct alternative basis for today's holding.

It is important to emphasize that this decision has no significance outside Bankruptcy Court. It imposes no new duties on corporate principals, nor does it create any new bases or theories for "piercing the corporate veil"[5] or for otherwise holding ownership or ownership's assets liable for corporate debts. This decision simply requires that when owners are going to spend corporate funds on private lands, then they should document the relationship by lease, license, option, partnership agreement, or otherwise. For if the corporation ends up in bankruptcy, the Court will not agree that the owners are entitled to benefit, at the expense of creditors, from their decision not to document the relationship.

But even if the relationship was not documented, the fiduciaries may rectify any problems and become free to deal with their property interests again after the corporate filing. They may do so by simply disclosing the facts and their intentions to creditors and to the Court and asking the Court to determine the extent of "property of the estate" (if it could not be agreed upon as among the fiduciaries and the beneficiaries of the bankruptcy estate).

If this simple precaution had been taken in the case at bar, there would be no dispute or possibility of multimillion dollar damages currently before the Court. But

---

**4.** The Court could possibly find a constructive partnership, or alter ego liability or the existence of a constructive trust or equitable lien on the basis of the facts at Bar, (see, for example, *In re Telemark Mngnt. Co.,* 43 B.R. 579 (Bankr. W.D.Wis.1984)) but it elects not to do so in favor of a holding that accords proper dominion to the concept of "property of the estate" (leaving the possibility of other findings to another day, if necessary).

**5.** For a recent Second Circuit statement regarding the principles underlying a piercing of the corporate veil under New York Law, see *William Pasalacqua Builders, Inc. v. Resnick Developers South, Inc.,* 933 F.2d 131 (2d Cir.1991).

that precaution was not taken. Instead, the fiduciaries and a major bidder here held unto themselves their intentions, and usurped the Court's authority to determine the extent and value of property of the estate, electing to treat the debtors' interest in the privately-held lands as non-existent, and electing to treat the value of the debtors' own assets to be appropriate for manipulation for private gain.

## SUMMARY OF HOLDINGS

■ The Court rules that when a corporate principal has caused the corporation to make large expenditures upon the principal's own land in undisputed anticipation of the corporation's sharing in the profits or proceeds of the development of the land for the benefit of both the corporation and the principal, the principal may not deny the existence of *at least* a contract right in favor of the corporation, when he never "gets around" to executing some recordable interest in favor of the corporation before he finds it necessary to put the corporation under the protection of Chapter 11. Rather, the corporation will be presumed at least to have the interest established by the parties' conduct; the precise nature and extent of the relative interests will be allocated by the Court after trial, if necessary. He and those who knowingly confederate with him will not be permitted to benefit from his gross failure, at the expense of the corporation's creditors, to deal fairly with the corporation.

6. John Smith's status as a principal officer, stockholder, or director is not disputed. Irene Smith's status as such is disputed. That there is a dispute in this regard is difficult to understand, as discussed later. John Smith signed a Statement of Affairs for OSL which listed Irene as "Managing Agent." She had been President and apparently never resigned, but she admits being only "sort of" a consultant, for which she received compensation. The Smiths claim to "lack knowledge or information" as to whether they are officers or directors or persons in control of the Debtors. An opportunity to observe their testimonial demeanor would be of benefit to the Court. Hence the Court will currently leave "open" Irene Smith's status.

7. The other Causes of Action allege, inter alia, that the Smiths' acquisition of the lands in their

In this Adversary Proceeding, the Trustee of the Corporate Debtors seeks, among other things, to set aside a lease of real estate on property adjacent to the real estate of debtor OSL, which adjacent real estate is titled in the name of John and Irene Smith,[6] who are not debtors under the Bankruptcy Code.[7]

It was during a period in which various bidders were considering how much to offer to purchase the real estate owned by the debtor corporations and to induce the Smiths to convey the adjoining lands titled in their names, that the Smiths executed a lease upon their lands in favor of one of the bidders without first seeking Court approval or notifying the OSL creditors of their willingness and intention to transact an interest in their lands that would exclude OSL, and that they were willing to do so at the price offered by SSWS, Inc. Although John Smith, at least, was the principal of a corporate Debtor-in-Possession, the Smiths cashed-in their own assets[8] in a way that both denied value to OSL and also granted leverage to SSWS which could depress the value of those assets of the corporation for which SSWS was otherwise to compete, thus diminishing the corporation's creditors' prospects for recovery.[9]

As will be illuminated herein, a principal of a corporation in Chapter 11 does not have the right to so engage in self-dealing that profiteers on his own pre-petition connivance or misfeasance or that interferes with the efforts to liquidate or reorganize the Debtor-in-Possession. His fiduciary

own name rather than in the corporate name was itself wrongful. Those causes are not currently before the Court.

8. For purposes of this formulation, it will be assumed arguendo that the leased real estate is properly that of the Smiths individually. See footnote ə 11.

9. The Smith lands were a critical element of a planned expansion of the landfill. Corporate assets were used to develop the Smith lands for that project. Without the Smith lands, the debtors' assets were worth little, and vice versa. It was obvious to all that if the Smiths could effectively convey "their" lands, and did so before the D–I–P's assets were sold, the Smiths' grantee could "steal" the debtors' assets.

duty is not just that of a corporate officer or director, it is the duty of high trust imposed on the "representative of the estate" pursuant to 11 U.S.C. § 323(a), 11 U.S.C. § 1101(a), and Rule 9001(5), of the Rules of Bankruptcy Procedure. The Plaintiff is correct in stating that "When OSL became a Debtor-in-Possession under the Code, the fiduciary duty of its directors and officers to the corporation's creditors was heightened." [Trustee's Memorandum of Law in Support of Trustee's Motion for Partial Summary Judgment, at 31, 32.] SSWS, Inc. is incorrect in responding that ". . . no matter how the duty is defined or how heightened the duty may be in bankruptcy, there is nothing in the law to support the Trustee's definition of the fiduciary duty in this case." [10] [SSWS' Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment, at 46, 47.] And it is wrong in stating that "there is no statute or case law which holds that the fiduciary duty of a corporate director or officer includes a duty not to deal with the directors' or officers' individual assets." Id. If SSWS intends thereby to suggest that there is no barrier to dealing with individual assets in a manner that one may reasonably conclude would wrongfully negate the existence of assets of the corporate D–I–P or would diminish the value of those or other assets of the debtor, SSWS is mistaken.

The Court also finds that SSWS was fully aware of the facts giving rise to the Smith's inability to convey a "clear" leasehold to them and must not be permitted to benefit from John Smith's malfeasances.

Important here is the undisputed fact that the value of the OSL assets and the Smith assets separately were not as great as the value of the combination of the two. Although terribly overworked in current management literature, the term "synergy" is a meaningful word which reflects a circumstance in which the value of a whole is greater than the sum of the value of its parts taken independently. (For an early Supreme Court case examining a synergistic situation in a bankruptcy context with meaningful similarities to this case (and with similar results) see *Crites, Inc. v. Prudential Ins. Co.*, 322 U.S. 408, 64 S.Ct. 1075, 88 L.Ed. 1356 (1944).) The value of the OSL land if sold alone is far less than the value of the OSL lands if combined with the Smith lands [11] in a "package deal." There is synergistic value to the corporate lands and possibly to the Smith lands as well. For illustration, let us examine the actual undisputed facts, but using hypothetical, totally-fictional values:

OSL owned and operated a duly-licensed sanitary landfill in need of either expansion or safe closure. Presume the OSL lands to be worth only $10 million alone, and OSL to have $100 million in debt, with its land being its only asset. The Smiths owned the surrounding lands available for landfill expansion. Presume the Smith lands to be worth $20 million alone. Presume the combination of the two to be worth $40 million. The portion of the extra $10 million that would be attributable to OSL for payment of its creditors would be a matter for negotiation or decision, but it is clear that the corporate creditors would receive something more than $10 million and less than $20 million, and that the Smiths would receive something more than $20 million, but less than $30 mil-

10. As the lessee, SSWS has vigorously opposed recision of its lease. It would rather have the Court impose a constructive trust on the lease payments SSWS is making to the Smiths ($30,000 per month). For their part, the Smiths ask the Court to characterize the "lease" as an "option": They ask that the Court construe certain language in the Schedule of Rental Payments, together with the fact that the relationship is terminable at will by SSWS, to declare it to be an expired "option," permitting them to retain all payments received thus far, and be free to negotiate the sale of their rights to the corpora- tion which defeated SSWS in efforts to obtain the Debtor's lands.

11. Both in the current Summary Judgment Motion and in causes of action that are not currently the subject of Summary Judgment Motions, the Trustee challenges the characterization of lands as being "Smith lands," since he alleges that they are lands of the corporation either by virtue of constructive trust, equitable lien, usurpation of corporate opportunity, or other similar theory.

lion. If a bidder reaches agreement with the Smiths alone for $25 million, not only might they have gotten some value that should have gone to the corporation, but the corporation will *not necessarily receive even the $10 million* that its land was thought to be worth independent of the Smiths' land. It would be worth $10 million only if a buyer can be found who is interested in that land regardless of the disposition of the adjacent land. But if buyers were only willing to pay $10 million for the corporate lands so long as there was an opportunity to bid for the Smiths' lands, it is also possible that there will be no bidders interested in the corporate lands with the Smith land already "gone," except the bidder who had already obtained the rights to the Smith land.

For reasons to be discussed later, it is not necessary to know whether Smith's self-dealing did in fact depress the value of the corporate assets. It is only necessary to know that his self-dealing reasonably had that potential. That it had that potential in this case is obvious from the above hypothetical and the fact that SSWS, an affiliate of Sevensen Environmental, is a major competitor of the other key bidders for OSL's assets—Waste Management (with which WMNY is affiliated), Browning Ferris, Laidlaw, and CID, among others.

## PART TWO. ANALYSIS

### Introduction

Before discussing the authorities upon which this decision is based, it may be useful to set aside certain specious arguments made by SSWS.

SSWS argues that this Court cannot tell the Smiths what to do with "their lands". Assuming the Trustee is incorrect in claiming that the corporations have a property interest in the "Smith lands," then it seems clear that the Smiths could not be forced to

sell or lease their land at all, absent their filing of personal bankruptcy, or their suffering a non-bankruptcy receivership, or the like. But that is not the question before the Court. The circumstances before the Court are those in which the principals have made an election to deal with their assets at the same time that corporate assets are being offered for sale. Those circumstances are decisive: The Smiths elected to lease their lands for their own benefit at a time when their transactions with the Debtors were under scrutiny and when doing so gave the lessee leverage to obtain the OSL lands at a lesser price. What might have happened if the Smiths had wished to wait two years, 10 years, to pass the land to their grand-children, etc. is utter speculation and irrelevant. It is just as plausible that the corporate assets would have fetched a premium price while the Smith lands were "not for sale," as is the contrary proposition.[12]

SSWS, in its brief, makes much of its understanding that no limitations were placed by the Court or by stipulation on SSWS's ability to discuss a possible acquisition with the Smiths. Assuming that this is true, there is nonetheless a decisive difference between negotiating with the Smiths (and even agreeing with them, subject to Court approval) on the one hand, and actually consummating a lease transaction on the other. Evidence that others were seeking to "lock-up" the Smiths[13] is irrelevant, since it cannot be presumed that others would fail in the same manner that SSWS failed, to seek Court approval. (Someone, presumably, would have examined the applicable law.)

SSWS relies heavily on evidence of the Smith's belief that the Bankruptcy Court had no "control" over them and their personal assets. What the Smiths believed is not pertinent to the question of whether John or Irene or both, as a matter of law,

---

**12.** Although the Court today concludes that OSL has an interest in the proceeds or profits from the lands in question, the Court does not suggest that it could have compelled the Smiths to sell had they chosen not to do so. A commissioned real estate agent cannot force a sale at less than

the "listing price," but he or she is entitled to a commission once the seller agrees to sell, regardless of price. The current concept is not different.

**13.** SSWS's Memorandum of 12/4/92 at 12–22.

converted property of the estate or breached any fiduciary duty to the estate. Although it may be pertinent to the question of whether a violation of 18 U.S.C. § 152 occurred, and therefore pertinent to the Trustee's cause of action based on that statute (the Ninth Cause of Action), wrongful knowledge and wrongful intent *of the fiduciary* are not essential elements of a cause of action to set aside an unauthorized post-petition transfer or to undo a breach of fiduciary duty.[14]

SSWS places considerable reliance also on its belief that the bidding process that occurred after the execution of the lease demonstrated that the lease was not "preemptive," and that the lease did not, therefore, depress the value of the debtor's assets. SSWS's reasoning in this regard escapes the Court. There is no genuine dispute that some bidders walked away once the Smith lands were "gone," and that the other post-lease bidder, WMNY (an affiliate of Waste Management) was of the belief that the Court could not compel the Smiths to convey their land[15]. Smith approval was still thought to be desirable or necessary, so WMNY offered in its bid for the OSL assets, (which bid contained a precondition that the SSWS lease be set aside) provisions for the Smiths' interests that WMNY believed treated the Smiths at least as well, and perhaps better, than did the SSWS lease. Thus, the April 10, 1992 letter of intent by Waste Management of North America, Inc. stated, at paragraph 14(b),

> The Trustee requires proof of the Smith's acquiescence to this letter of intent, but the letter of intent executed by SSWS, Inc., the Trustee, and the Smiths contains a provision that the Smiths cannot negotiate with any third party until March 19, 1992 [sic]. Waste Management, however, believes that, if the Special Counsel is successful in his action [to

set aside the SSWS lease], the Smiths would find this letter of intent acceptable because it contains substantially the same or better terms as those contained in the SSWS letter of intent.

It is, therefore, disingenuous for SSWS to assert that the post-lease bids and bidding process resembled that which would have occurred had there been no consummated deal between it and the Smiths: the lease established not only a "base line" in its treatment of the Smiths which the only other remaining bidder, WMNY, felt it had to meet or exceed if the Smiths were going to be induced to sell "their assets," but also established a vast "transaction cost" in the effort to set aside the lease. (WMNY committed sizeable expense to meeting the emergency need to address environmental concerns at the landfill, while awaiting the results of this litigation. It is also apparently funding the Trustee's efforts herein.)

Simple algebra belies SSWS's argument: If the value of the two parcels together is T and T is made up of two elements, O (the value to be attributed to the OSL part) and S (the value of the Smith part), then fixing the value of S defines O.[16]

SSWS argues that the Court is incorrect in considering the value T to be fixed, since in fact T went up because of WMNY's post-lease bidding. SSWS's argument defies credulity in its arrogance: It may be paraphrased as "We thought we had driven the competition out by 'locking up' the Smith lands, but WMNY was certain enough that we had misread the law that it 'bet' that our lease could be set aside. We had to keep bidding the price up to avoid the lawsuit. We thought we won until the Bankruptcy Court refused to approve the Trustee's recommendation that our bid be accepted. The fact that we failed in our objective proves that the lease was not preemptive."

---

14. The matter of SSWS's undisputed knowledge as a confederate, and Irene Smith's inability to convey a valid leasehold whether or not she was a fiduciary, is discussed in the "Complicity" portion of this decision.

15. Waste Management was also a principal pre-lease, pre-bankruptcy bidder who had also con-

ducted a "due diligence" in its investigation of the facts, at various points in time.

16. This simplified analysis ignores the fact that the transaction cost of litigating the lease is another element depressing the value of O.

The Court finds that the fact that we are here today in litigation over possibly millions of dollars in damages, and the fact that the Trustee felt obliged to recommend SSWS's *lower* bid (valued at $28,075,000) over WMNY's *higher* bid (valued at $30,-293,000, if the lease is set aside) in order to *avoid* this litigation, proves that the lease *was* pre-emptive, regardless of WMNY's tenacity in refusing to surrender to SSWS's tactics.

What should have happened in this case is that if the Smiths wanted the terms which SSWS offered, then all competitors should have had an opportunity to bid for the corporate assets and the Smith interests together, assuring the Smiths their price. Ultimately the Court would have decided, if necessary, whether the allocation of value was fair as between the Smiths and the Chapter 11 Debtors. (Since the synergistic value was likely higher than the corporate debt, and all surplus would have belonged to the Smiths as owners of the corporations, it is likely that no Court intervention would have been required.)

PART TWO–A. THE LEASE WAS AN UNAUTHORIZED TRANSFER OF PROPERTY OF THE ESTATE

(1). An "interest in property" does not require demonstration of a "property interest."

■ It is clear under 11 U.S.C. § 541(a) that if the debtor corporations possessed any "legal or equitable interest" in the Smiths' lands as of the filing date, then that interest was "property of the estate," and any act by the Smiths, by SSWS, or others to "exercise control" over or to negate such interest might be voidable under 11 U.S.C. § 362(a)(3), and any unauthorized post-petition "transfer" thereof is avoidable under 11 U.S.C. § 549(a).

The Trustee alleges that the lease violated the post-petition property rights of the Debtors' estates. The defense raised by SSWS is remarkably simple, but wrong. It is this: during the period that the Smiths caused OSL to pay the taxes upon the Smiths' properties, to spend $2.4 million preparing the Smith properties and OSL properties for landfill expansion, to make application for a permit thereon in OSL's name, and so forth, it may have been "hoped for, anticipated, assumed, expected, or even understood" [17] that OSL would "make a lot of money off of the expanded landfill" [18]. But because "Smith as principal" of OSL never demanded from "Smith as an individual" any documented consideration for these expenditures, then "Smith's record ownership as an individual" must prevail and Smith is free to work a forfeiture of OSL's investment for his own profit at the expense of OSL's creditors!

This defense places too much reliance on the absence of a written agreement between the John Smith as an individual and the corporation he controlled; in so doing it ignores ancient, well-settled rules. Moreover, it relies upon the Court's willingness to presume that as between the Smiths and the corporation, a verbal agreement could be proven only if the Trustee can establish that words were exchanged between John Smith as principal and the Smiths as individuals, as might be exchanged among strangers dealing at arms length. For the Court to accept the latter argument would be for the Court to grant John Smith, who had a fiduciary duty to protect OSL's investment in the expansion property, every inference that *he failed to do so,* and the *benefit* thereof, so that *he* might profit greatly from that omission now.[19]

Equity exists for the very purpose of avoiding such injustice, and 11 U.S.C. § 541(a) is broad enough to protect the creditors of the corporation. It is broader than the parties' memoranda credit it with.

17. SSWS's Reply Memorandum at 19.

18. SSWS Memorandum at 7.

19. New York law does not ask very much in exchange for the protections afforded by the privilege of operating through a corporate entity. (As the historic home of American corporate enterprise, it perhaps asks less in this regard than does any other state.) The current arguments are an insult and threat to those who respect that privilege.

In his zeal to convince the Court that OSL does indeed possess a "legal or equitable interest" in the Smiths' property, the Trustee attempts to place a number of alternative characterizations on his interpretation of the facts and equities in the case. Thus, he argues that OSL is the *equitable owner* of the "expansion property" (the Smith lands) by virtue of the alter ego doctrine, or by application of equitable estoppel. He alternatively argues that OSL was the *beneficiary of a "passive or dry trust" or constructive trust* in the Smith properties. As a further alternative, he argues that OSL held a *partnership interest* in all of the expansion properties, or a *joint venture interest,* a *leasehold interest,* or a *contractual right to operate a landfill* upon those properties.

SSWS responds in kind, addressing each of the Trustee's characterizations seriatim.

But lost in the polemics is the fact that by the words of 11 U.S.C. § 541 itself the Trustee need only establish that OSL had a "legal or equitable interest" sufficient to warrant the notice of this Court and the protection of the Bankruptcy Code: it is not necessary for the Trustee to establish the nature of the Debtor's "estate," if any, in such lands. Put another way, if the Trustee can establish that the Debtor had some kind of valuable interest that was interfered with by the lease, he may defeat the lease to that extent (though more might be required for purposes of determining the relative value of the Smiths' and Debtors' interests under, for example, 11 U.S.C. § 363(j)).

■ There was no writing, supposedly, granting OSL any interest. But it is not questioned that OSL was intended by the Smiths to profit from the expanded landfill, and that John Smith caused value to flow from OSL to his land in exchange for that right. Under these circumstances, the absence of a writing manifesting OSL's interest is not fatal for two reasons: (1) it is not necessary that OSL be shown to have an interest in the Smiths' lands themselves, merely that OSL have a contract right or other right that would be denied, extinguished, or devalued by the Smiths' trans- fer of the land or transfer of the right to develop it, and (2) as between John Smith (if not both Smiths) and OSL, neither a writing, nor proof of a verbal agreement, is necessary in order to establish an interest that is protected as "property of the estate."

### (2). An "executory contract" is protected under the Code.

■ The Ninth Circuit Court of Appeals has on three occasions stated that "an executory contract that is property of the estate can only be terminated after a grant of relief from the stay." It has done so in two cases that are analogous to the case at bar. Thus in the case of *In re Carroll,* 903 F.2d 1266 (9th Cir.1990), it held that a management agreement under which the debtor was to manage a certain motel in return for eight (8%) percent of the motel's gross receipts was "property of the estate" and "was protected by the automatic stay to the extent of the rights provided for in the agreement" and that consequently, the other contracting party's unilateral exercise of a termination clause contained therein, without obtaining relief from the stay, violated the stay and rendered the attempt to terminate the agreement ineffective.

Similarly, in the case of *In re Computer Communications, Inc.,* 824 F.2d 725 (9th Cir.1987), that Court stated that "all parties benefit from the fair and orderly process contemplated by the automatic stay and judicial relief procedure. Judicial toleration of an alternative procedure of self-help and post hoc justification would defeat the purposes of automatic stay. Accordingly, we affirm the Bankruptcy and District Courts on the ground that [the other contracting party] violated the automatic stay by unilaterally terminating the contract." *Id.* at 750. (The contract in question was a "Joint Marketing and Development Agreement," under which the other contracting party would make certain minimum quarterly purchases from the debtor in exchange for enhanced price discounts,

technical support, training and other consideration.)

In a third case, less similar to the case at bar, that same court held that cancellation of liability insurance policies is automatically stayed by 11 U.S.C. § 362.[20]

The only other circuit to have addressed this question is the Third Circuit.[21] Initially, the Third Circuit found it necessary only to "assume without deciding" that the other contracting party was barred by 11 U.S.C. § 362(a) from terminating a certain contract without obtaining an order pursuant to 11 U.S.C. § 362(e).[22] (That contract called for production of military equipment by the debtor, governed by special statutory provisions governing assignability.) On one other occasion the Third Circuit addressed the question and disagreed with the Ninth Circuit only because the contract at question was one which could not be assumed and assigned because of the prohibition of 11 U.S.C. § 365(c)(2) and § 365(e)(2)(B). The Court held that the automatic stay does not apply to the post-filing termination of an executory contract to make a loan.[23]

This Court could hardly improve upon the analysis offered by those esteemed Courts. In agreeing with the 9th Circuit's holdings, this Court will add only the following few observations regarding the breadth of the notion of "property of the estate." It is essential that the true breadth of the notion be appreciated so that it may be realized that OSL need not establish any interest in the lands that are titled to the Smiths. It need only establish the existence of an agreement—an executory contract—under which OSL possessed rights that were destroyed, extinguished, devalued, or otherwise denied when the Smiths entered into the lease of those lands without appropriate process before this Court.

Thus it has been said:

[T]he term "property" is sufficiently comprehensive to include every species of estate, real and personal, and everything which one person can own and transfer to another. It extends to every species of right and interest capable of being enjoyed as such upon which it is practicable to place a money value.[24]

The concept of property is general enough to embrace everything that has an exchangeable value.[25] Any right that is not unlawful or against public policy, which has acquired a pecuniary value, becomes a property right entitled to protection.[26]

While it is true that in the sense employed in analysis of Constitutional rights, "property" does not include a mere subjective "expectancy" or a mere abstract need or desire, and there must be a legitimate claim of entitlement,[27] there is absolutely no reason to conclude that section 541 defines property of the estate so narrowly. (Moreover, appropriate consideration in return for perhaps as much as $2.4 million spent upon lands should be more than a "mere expectancy.")

Rather, section 541 was intended to include all forms of property that had been specified in section 70a of the Bankruptcy Act of 1898, and all other kinds of proper-

**20.** *In re Minoco Group of Companies, Ltd.,* 799 F.2d 517 (9th Cir.1986).

**21.** Many lower courts have also examined the question. Within the Second Circuit, a very careful analysis is found in the decision of Bankruptcy Judge Conrad in the case of *In re Drexel Burnham Lambert Group, Inc.,* 138 B.R. 687 (Bankr.S.D.N.Y.1992), which did not involve an automatic stay question, but wherein U.S. Bankruptcy Judge Conrad concluded that "executory contracts are property of the estate within the meaning of Section 541."

**22.** *Matter of West Electronics, Inc.,* 852 F.2d 79 (3rd Cir.1988).

**23.** *Watts v. Pennsylvania Housing Finance Co.,* 876 F.2d 1090 (3rd Cir.1989).

**24.** 68a Am.Jur.2d, Property Sec. 4.

**25.** *Associated Press v. International News Service,* 245 F. 244 (2d Cir.1917).

**26.** *Fisher v. Star Co.,* 231 N.Y. 414, 132 N.E. 133 (1921).

**27.** *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

ty, tangible or intangible, as well.[28] Section 70a of the 1898 Act vested a Bankruptcy Trustee with the bankrupt's title to such "kinds of property" as: documents relating to the bankrupt's property; interests in applications for patents, copyrights and trademarks; powers which the bankrupt might have exercised for his own benefit; rights of action which the bankrupt could have by any means transferred; and rights or possibilities of reverter or remainder.

■ It can be seen from the fact that 11 U.S.C. § 541(b)(1) excludes from the estate any "power" that the Debtor may exercise solely for the benefit of an entity other than the estate, that other kinds of "powers" must be included in the estate, by necessary implication. Examining the nature of a "power" is helpful in examining the breadth of the notion of "property of the estate," for it has been said that a power "is not property or a property right, even though it concerns property. Rather it is a mere right or power, a personal privilege or authority. Nor is it an estate, for it has none of the elements of an estate." [29] This demonstrates that "property of the estate" includes "mere" interests that are not themselves "property" or "property rights."

Citing the United States Supreme Court's admonition in the case of *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983) to the effect that a wide reading must be given to 11 U.S.C. § 541 or else "a reorganization effort would have a small chance of suc-

cess," one Bankruptcy Court analyzed the wide range of intangible interests found by other courts to be part of a debtor's estate: [30] a liquor license; a building permit, a license agreement; a right of redemption subsequent to confiscation of property due to tax levy; franchise rights; the debtor's interest in continued usage of a telephone number; a building contractor's certificate of competency; an interest in ERISA plans and profit sharing plans; and a utility deposit. That Court further noted authority for the proposition that intangible interests may be considered property of the estate even though non-bankruptcy law designates them as "privileges" and not "property rights," and the Court was led to conclude that "if the disputed interest adds great value to the estate ... it was intended by Congress to fall within the scope of section 541." *Id.* at 660.

While this Court does not necessarily agree with the full import of that statement, this Court is not ready to reject it.[31]

(3). There was an "executory contract."

■ In the case at bar, there is no dispute as to facts giving rise to some legal or equitable interest, in favor of OSL, that limits the alienation of the Smith lands. It is not disputed that John Smith caused OSL to expend substantial monies in anticipation of OSL's sharing in the value of an expanded landfill upon the lands in question. It is not disputed that almost every step toward that goal (including making application for the permit in OSL's name) was undertaken.

28. H.R. Report 95–595 to accompany H.R. 8200, 95th Congress 1st Session (1977) pages 367 through 369.

29. 62 Am.Jur.2d, Powers of Appointment and Alienation, Section 7. [Citations omitted.]

30. *In re Professional Sales Corporation,* 48 B.R. 651 (Bankr.N.D.Ill.1985).

31. The Court in the Professional Sales case held that it could restrain the Environmental Protection Agency from revoking the Chapter 11 Debtor's interim permit for hazardous waste site, having concluded that the Debtor's interim status was a valuable asset under Section 541, and where other showings of entitlement were made. It is important to recognize that the

development of notions of "property rights" has not been a two-way street: much of it pertains to the question of what incidents of ownership are themselves property rights which the *land-owner* may enjoy. The case presently at Bar addresses, essentially, an interest *adverse* to the rights of the record owner. The fact that a mere "claim" against one who has valuable land has value because of its collectability from the land, does not of itself result in any interest in the land. Here, however, the claim and the land are indistinguishable because the principals have wielded the alleged absence of a writing and the separateness of the corporate identity as a sword rather than as a shield. They have used the corporate entity not to protect their private assets, but to improve those assets at corporate expense.

The sum and substance of the major litigation before this Court, then, is simply that "the precise relationship that would govern OSL's anticipated future use of the Smith Expansion Property was never finally resolved." (SSWS, Inc.'s Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment, at 7.) Despite the fact that a very substantial aspect of the value of the Smith lands was attributable to OSL's existence, efforts and expenditures, the position of SSWS is that unless the Trustee can advance a theory "to negate the Smiths' record ownership of the Smith property, ... the Smiths' record ownership must stand."[32] This statement is flatly wrong where all evidence of prepetition events clearly bespeaks a corporate interest in profits or proceeds from the combined properties and clearly contradicts post-petition protestations to the effect that all that the corporation possessed was a claim against the Smiths and not a right to prevent a disposition of their land that would deny OSL those profits or proceeds.

Hence, one must ask whether the Trustee has established the existence of an agreement—an executory contract—between OSL and the Smiths, that was protected as "property of the estate." The burden is not on the Trustee to "negate" the Smiths' record ownership. The undisputed facts compellingly demonstrate an agreement between OSL and at least one of the Smiths by which OSL would share in the profits of the combined lands if they were not sold, and in the proceeds of sale of the combined lands if they were sold.[33] Such a contract need not be in writing for a number of reasons in the case at Bar.

Firstly, "a contract relating to disposition of the proceeds of land, in case of its sale, is not one for an interest in the land within the meaning of the Statute of Frauds, and may be enforced, although not in writing, after the land has been sold."[34] Thus, an agreement between the Smiths and OSL whereby they all would share in the proceeds of the sale of the combined assets is outside the Statute of Frauds.

Secondly, the Court is here determining only the extent of the interests contained within OSL's bankruptcy estate, *at a minimum*, and if (after resolution of the disputed issues of fact regarding the present causes of action, and after resolution of the other causes of action) it were to be concluded that the agreement between the parties went beyond an agreement for the distribution of profits or proceeds of the properties after sale, such that the Statute of Frauds may be invoked, it is clear that the judicial gloss on the Statute of Frauds provides certain exceptions for the circumstances at Bar. The New York State provision requiring written evidence of the grant of an interest in land is General Obligations Law § 5–703. Even if the Smiths and OSL had been strangers at the time that OSL made its investments upon the lands titled in Smiths' name, the Statute of Frauds itself would provide for enforcement of an oral contract where equity compels specific performance thereof because of "part performance."

And thirdly, John Smith (at least) and OSL were *not* strangers. Rather he stood in a position of trust relative to OSL even prior to OSL's bankruptcy, and it is well established that the Statute of Frauds will not be a haven for one seeking thereunder to damage persons he is obliged to protect.

As to part performance, it has been said that the "Statute of Frauds will not be a bar to specific performance of an oral contract [regarding real property] where it has been demonstrated that there has been partial performance of the alleged agreement which is 'unequivocally referable' to the

---

**32.** SSWS, Inc.'s Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment at 28.

**33.** The Trustee asserts that the agreement was a "Joint Venture" agreement. He may or may not be correct. The full scope and nature of the relative equitable ownership interests of the Debtors and the Smiths, and of the agreement among them must await further discovery and, perhaps, trial.

**34.** 61 N.Y.Jur.2d, Frauds, Statute of, Sec. 106, and authorities cited therein.

agreement." [35] As a Judge of the highest court of the State of New York, Judge Cardozo cautioned that performance that is "unequivocally referable" means "performance which alone and without the aid of words of promise is unintelligible or at least extraordinary unless as an incident of ownership, assured, if not existing." [36] If the activities of OSL upon the lands of the Smiths are not so referable to an agreement to complete an expansion project and mutually derive the profits or proceeds from it, then the Court is hard-pressed to determine what those activities are referable to.

As noted, the Smiths and OSL were not strangers. In a somewhat inapposite context, Judge Cardozo recalled that "he who prevents a thing from being done may not avail himself of the non-performance, which he has, himself, occasioned, for the law says to him," in effect

> This is your own act, and, therefore, you are not damnified.... [S]ometimes the resulting disability has been characterized as an estoppel, sometimes as a waiver. We need not go into the question of the accuracy of the description. The truth is that we are facing a principle more nearly ultimate than either waiver or estoppel, one with roots in the yet larger principle that no one shall be permitted to found any claim upon his own inequity or take advantage of his own wrong. *The Statute of Frauds was not intended to offer an asylum of escape from that fundamental principle of justice.*[37] [Emphasis added. Citations omitted.]

It has been said, consequently, that the "Statute of Frauds which is designed to prevent fraud where people deal at arms length, may not be used as an instrument of fraud where people foolishly perhaps, rely on a confidential relationship." [38] And it has been decisively stated by the highest court of the State of New York that although the Statute of Frauds will "ordinarily prevent enforcement of an oral agreement to convey an interest in land, ... a constructive trust will be impressed ... when an unfulfilled promise to convey an interest in land induces another, in the context of a confidential or fiduciary relationship, to make a transfer resulting in unjust enrichment ... [T]here must be '(1) a confidential or fiduciary relation, (2) a promise, (3) a transfer in reliance thereon, and (4) unjust enrichment'." [39]

Otherwise stated,

> [T]he Courts have applied the truism, that the Statute of Frauds may be used as a shield but not as a sword, in permitting recovery on equitable grounds despite the absence of a signed writing where the facts spell out an estoppel. 'It would be quite antagonistic to the spirit of a statute designed to prevent fraud, if it might be availed of to cover fraud. Therefore, it has been long the settled rule, in England as here, that when a parol agreement for the conveyance of real estate, void by the Statute of Frauds, has been proved and part performance has been shown by acts of the parties seeking relief, which could have been done with no other design than that of performance, if an action at large is not an adequate remedy, the agreement will be specifically enforced.... Where by a refusal to execute the parole agreement, the other party, who has in part performed, cannot be placed in the same

**35.** *Uskokovic v. Radunovich,* 127 A.D.2d 830, 511 N.Y.S.2d 944 (1987); *Spodek v. Riskin,* 150 A.D.2d 358, 540 N.Y.S.2d 879 (1989).

**36.** *Burns v. McCormick,* 233 N.Y. 230, 135 N.E. 273 (1922).

**37.** Concurring decision in *Imperator Realty Co. v. Tull,* 228 N.Y. 447, 127 N.E. 263, 266 (1920), which case and decision involved an effort to rely on the terms of a written contract despite a verbal waiver of certain provisions.

**38.** *Wong v. Wong,* 237 N.Y.S.2d 153, 154 (Sup. Ct.Sp.Term Nassau County 1962), denying Summary Judgment where the Summary Judgment Motion was premised on the lack of a written agreement by which the moving parties' parents were to possess a life estate in lands deeded to the sons, which sons were attempting to dispossess their parents.

**39.** *McGrath v. Hilding,* 41 N.Y.2d 625, 394 N.Y.S.2d 603, 610, 363 N.E.2d 328, 335 (1977). Citations omitted.

situation in which he was before such performance, then an irreparable injury is threatened and equity will intervene upon the ground that it would be a fraud if the transaction were not completed.' No elaborate analysis ... is needed to reach the only just conclusion that defendants should be estopped from invoking the Statute of Frauds and be held to the agreement which was actually made and carried out in part to defendants' unfair advantage and plaintiff's serious loss.[40]

It is thus abundantly clear that the absence of a writing is not fatal to the existence of an enforceable agreement between OSL and the Smiths in relation to *at least* a division of the profits from the combined lands.[41] Further litigation will determine whether OSL's enforceable interest was even greater.

The Court will not credit John Smith's self-serving representations that no verbal agreement existed. Paraphrasing an argument offered by the Trustee in open court, this Court will not require the Trustee to prove that "the right side of John Smith's brain made an agreement with the left side, regarding these properties." John Smith was a fiduciary of OSL, and as will be discussed later, his transactions with the corporation are subject to the most careful scrutiny. If OSL was to receive nothing in return for its expenditures on the Smith lands, then the Smiths (or at least John)[42] should have assured the existence of careful documentation of the precise relationship between them and the corporation, so that it might now be carefully scrutinized and challenged. Having failed to do so, he

may not now complain of this Court's application of the ancient doctrine that a contract may be inferred from the facts and circumstances of the case. Thus it has been said that one who makes

agreement by conduct rather than declared intention, must be held to be equally bound since in the law there is no distinction between agreements made by words and those made by conduct.... [I]n determining whether the parties possessed the necessary intention to contract, an objective test is generally to be applied. That means, simply, that the manifestation of the parties' intention rather than the actual or written intention is ordinarily controlling ...

A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known interest. If, however, it were proved by twenty bishops that either party, when he used the words, intended something else than the usual meaning which the law imposes on them, he would still be held, unless there were some mutual mistake, or something else of the sort.... [A]n agreement by conduct does not differ from an express agreement, except in the manner by which its existence is established.[43]

From SSWS's own arguments it is readily discerned that *at most*, the only "detail" remaining unresolved as between OSL and the Smiths was the precise form of the business relationship and the allocation of value. The Smiths themselves claim (in their present affidavits) that it was to be a

---

**40.** *McKay Products Corp. v. Jonathan Logan, Inc.,* 54 Misc.2d 385, 283 N.Y.S.2d 82 (Sup.Ct.Sp. Term New York County 1967). Citations omitted.

**41.** This conclusion as it applies to Irene Smith even if she is not a fiduciary is explained later in this decision.

**42.** Irene claims to know little about the details of OSL's expenditures upon her lands during 1988, 1989 and 1990 despite her actively serving as President of OSL until at least 1986 and her serving as "consultant" thereafter. On the other hand, there is testimony that she has been ill. The Court will assess such matters at trial.

**43.** *Ahern v. South Buffalo Railway Co.,* 303 N.Y. 545, 104 N.E.2d 898, 907 (1952). And it has been further stated that "a contract implied in fact may result as an inference from the facts and circumstances of the case, although not formally stated in words ..., and is derived from the 'presumed' intention of the parties as indicated by the conduct.... It is just as binding as an express contract arising from declared intention, since in the law there is no distinction between agreements made by words and those made by conduct." *Jemzura v. Jemzura,* 36 N.Y.2d 496, 369 N.Y.S.2d 400, 407, 330 N.E.2d 414, 419 (1975).

Joint Venture (but that it was "never entered into").

The undisputed facts evidencing agreement between the Smiths and OSL are collectively overwhelming; individual indicative events that occurred on a day-in and day-out basis over a considerable period of time are well catalogued and not disputed.[44] And there is *not a single shred of evidence* consistent with the only theory that is consistent with the leasing to SSWS, that being the theory that OSL was to have no interest in the use of the Smiths' portion of those lands. SSWS's assertions to that effect are cut from whole cloth. The fiduciary and his confederates may not so "stand silent," claim the benefit of the failure to protect the corporation and its creditors, and compel his victims (those creditors) to carry inequitable burdens.[45]

■■■ SSWS argues that if there was an executory relationship between OSL and the Smiths, it expired sixty days after the filing of the petition, pursuant to 11 U.S.C. § 365(d)(4). This is incorrect for three reasons. First, in a Chapter 11 case, that provision applies only to unexpired leases of nonresidential real property. It would not apply to any executory agreement between OSL and the Smiths that is not a lease. A partnership agreement, an agreement to share the profits or proceeds from the sale of the expanded landfill, a joint venture agreement, or the like, are not "leases." Second, that provision, added in the 1984 amendments to the Bankruptcy Reform Act, ought not to be construed to protect the debtor's own fiduciaries who seek to use the provision against their own corporation, or such fiduciaries' confederates. And third, that provision ought not to be enforced in favor of the party who caused the leasehold interest to be omitted from the debtor's schedules in the bankruptcy proceeding, or in favor of his confederates.

The lease to SSWS here constituted a wrongful exercise of exclusive dominion over, and unilateral termination of, the Debtor's interest in the combined property. It created a "leasehold" in a portion of the properties and conveyed it, and thereby deprived OSL and the affiliated companies of the benefits those companies enjoyed under an executory contract to share in the profits or proceeds of the combined properties. As such, the lease may be set aside as a violation of 11 U.S.C. § 362.

PART TWO–B. PRINCIPAL OFFICERS, DIRECTORS, SHAREHOLDERS AS POST–PETITION FIDUCIARIES

(1) Introduction

That the principal officers and directors of a corporate Debtor-in-Possession are fiduciaries who must act for the benefit of *creditors* is beyond cavil. The United States Supreme Court itself has noted the

---

**44.** Under John's control (and perhaps in "consultation" with Irene), OSL paid the taxes on the Smith lands; used the properties; paid the insurance thereon, spent $2.4 million for engineers, lawyers, consultants and hydrogeologists to prepare the whole site (the OSL and Smith lands combined) for development; made the application for the expansion permit and paid the $5,000 fee therefor, and regularly worked upon the lands digging monitoring wells, etc. The Smith lands had been purchased since 1982 at a total price of less than $200,000.

**45.** If the Smiths had intended for all purposes to reserve unto themselves all rights to the lands titled to them and to deny any possible interest of the corporations in those lands, they might have attempted to do so simply by executing a license in favor of OSL to permit OSL access to their lands for limited purpose and limited time. Promptly upon filing OSL's Chapter 11 petition,

OSL's creditors would have examined the bona fides of that status, and the Smiths would have had (at the least) to disclose their intent to revoke the license. The burden would have been upon the Trustee to prove that such "license" did not manifest the true relationship between the parties. But here where they claim that nothing at all was executed—nothing at all in respect of the privileges accorded by law which permitted the Smiths to operate through the separate entity of a corporation—and where SSWS would have the Court hold that the creditors who contributed to OSL the labor, materials, or other resources that were directly or indirectly applied to the development of the Smiths' own land should be held to have no rights at all in the fruits of those lands unless the Trustee can establish that OSL owned some "estate" therein by virtue of statute or case law, the Court will find what the facts bespeak. They do not bespeak a license.

significance of "the change which the filing of the petition and judicial approval of the Debtor's remaining in possession necessarily cause in the *obligations* if not in the day-to-day *activities* of all responsible officials [of a corporate debtor undergoing reorganization]. The Court's willingness to leave the Debtor-in-possession is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a Trustee." *[Emphasis in original]*.[46] Although the Supreme Court made these statements in the context of the 1898 Act during a time in which a corporate debtor continued in possession only on order of the Court, there is no question but that the "automatic" continuation of the debtor as a "debtor-in-possession," accomplished by the interplay of 11 U.S.C. § 1101(1), § 1107, and § 1108, operates on the same premise.

As stated by the Supreme Court, the fiduciary standard applicable to a debtor-in-possession is that of "Trustee." Congress too stated that 11 U.S.C. § 1107 "places a debtor-in-possession in the shoes of a Trustee in every way." Not only is the debtor given the rights and powers of a Chapter 11 Trustee, but the debtor "is required to perform the functions and duties of a Chapter 11 Trustee (except the investigative duties)." [47] Obviously, a debtor corporation acts through its agents, and thus it is its principals who must perform the fiduciary duties of the corporation: "... if a debtor remains in possession—that is, if a Trustee is not appointed—the debtor's directors bear essentially the same fiduciary obligation *to creditors* and shareholders as would the Trustee for a debtor out of possession." [48] [Emphasis added.]

In the case at Bar, a consultant, Alan Singer, was retained not as Trustee, but as a consultant to manage the day-to-day op-

erations of OSL and its affiliated companies. He was not appointed under 11 U.S.C. § 1104, and did not displace John Smith (or Irene Smith, to the extent she is found to have been a fiduciary.)

Thus, John Smith (at least) remained a fiduciary for the benefit of the corporate debtors-in-possession which he controlled *and the creditors of those companies.*

### (2) The Nature of the Post-petition Fiduciary Duty

It being thus established that John Smith was a fiduciary for the benefit of the corporations and the corporations' creditors, and that from among the various types of fiduciaries, he must be held to be a "Trustee," it is useful to set forth what that status entails.

Mr. Justice Douglas spoke for the U.S. Supreme Court when he addressed the fiduciary responsibilities of Directors and Stockholders in the context of a bankruptcy case wherein the "dominant and controlling stockholder" of the bankrupt corporation asserted salary claims against the corporation. Upholding the power of the Bankruptcy Court to subordinate such claims, the following was said in relation to what the Court described as "the violation of rules of fair play and conscience by the claimant; a breach of the fiduciary standards of conduct which he owes to the corporation, its stockholders and creditors":

He who is in such a fiduciary position cannot serve himself first and his cestuis second. He cannot manipulate the affairs of his corporation to their detriment and in disregard of the standards of common decency and honesty. He cannot by the intervention of a corporate entity violate the ancient precept against serving two masters. He cannot by the use of

---

**46.** *Wolf v. Weinstein,* 372 U.S. 633, 83 S.Ct. 969, 10 L.Ed.2d 33 (1963). "The books are full of declarations that an insolvent holds his property in trust for his creditors; and, when the insolvent is a corporation, whose directors were concededly fiduciaries as to shareholders, they become doubly fiduciaries of the creditors upon insolvency." L. Hand, J., dissenting in *In re Calton Crescent,* 173 F.2d 944 (2d Cir.1949).

**47.** House Report No. 95–595, to accompany H.R. 8200, 95th Congress, First Session, (1977), page 404, U.S.Code Cong. & Admin.News pp. 5787, 6360.

**48.** *CFTC v. Weintraub,* 471 U.S. 343, 355, 105 S.Ct. 1986, 1994, 85 L.Ed.2d 372 (1985), *and see In re Frankel,* 77 B.R. 401 (Bankr.W.D.N.Y. 1987).

the corporate device avail himself of privileges normally permitted outsiders in a race of creditors. He cannot utilize his inside information and his strategic position for his own preferment. He cannot violate rules of fair play by doing indirectly through the corporation what he could not do directly. He cannot use his power for his personal advantage and to the detriment of the stockholders and creditors no matter how absolute in terms that power may be and no matter how meticulous he is to satisfy technical requirements. For that power is at all times subject to the equitable limitation that it may not be exercised for the aggrandizement, preference or advantage of the fiduciary to the exclusion or detriment of the cestuis. Where there is a violation of those principals, equity will undo the wrong or intervene to prevent its consummation.[49] [Citations omitted.]

Earlier, then-Chief Judge Cardozo of the Court of Appeals of New York, speaking for the Court regarding the fiduciary duties among co-partners, stated:

> Many forms of conduct permissible in a workaday world for those acting at arms length are forbidden to those bound by fiduciary ties. A Trustee is held to something stricter than the morals of the marketplace. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment by this court. [Citations omitted.][50]

**49.** *Pepper v. Litton*, 308 U.S. 295, 310, 60 S.Ct. 238, 247, 84 L.Ed. 281 (1939).

**50.** *Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545, 546 (1928). The Meinhard case and others have been viewed by one commentator (Scott, *The Trustee's Duty of Loyalty*, 49 Har.L.Rev. 521 (1936)) as establishing the proposition that just as a Trustee would violate his or her duty to the beneficiary if he or she purchases trust property for himself or herself, he or she may also violate the duty of trust by purchasing for himself or herself from a third person an interest in the same subject matter as that of the trust. (Meinhard and Salmon were joint venturers as lessees of a hotel. After the term of the lease expired, Salmon obtained a new lease for his own benefit behind the back of Meinhard. A slim majority of the New York Court of Appeals held that although the parties had no right of renewal of the lease, the defendant had a "pre-emptive opportunity" which should be viewed as an incident of the joint enterprise.)

Similarly, the commentator examined the case of a Trustee who purchased the interests of one who had an encumbrance upon the trust property, the commentator saying that "It is true that his purchase of the encumbrance for himself would not result in any loss to the trust estate even if the trustee were permitted to enforce it, since he would receive no more than any holder of the encumbrance would be entitled to receive. Any profit which would make would therefore not be at the expense of the trust estate. *It is,* however, *against public policy to permit the trustee to make a profit for himself from a transaction so closely connected with the administration of the trust.* It is not improper for him to purchase the encumbrance, but it is improper for him to make a profit thereby. If instead of continuing to hold the encumbrance he resells it at a profit, he is accountable to the beneficiaries of the trust for the profit. If it was the duty of the Trustee to purchase the encumbrance for the trustee estate and he purchases it for himself, it would seem that he is accountable not merely for any profit he makes thereby, but for any profit which would have been made by the trust estate if he had purchased it for the trust." [Emphasis added.] Thus the Trustee was required to sell the encumbrance to the trust estate for the price which he had paid for it, which was less than the value of the encumbrance.

Thoroughly analyzing other issues regarding the duty of loyalty, the commentators conclude that

> "As long as he is not acting in his own interest the standard fixed for his behavior is only that of a reasonable amount of care and skill and caution. When, however, the Trustee acts in his own interest in connection with the performance of his duties as Trustee, the standard of behavior becomes more rigorous. In such a case his interest must yield to that of the beneficiaries. Where he deals directly with the beneficiaries, the transaction may stand, but only if the Trustee makes full disclosure and takes no advantage of his position and the transaction is in all respects fair and reasonable. When he acts without the consent of the beneficiaries, the transaction will be set aside even though it was otherwise fair

The rule is that

a trustee can make no profit out of his trust ... [this rule] springs from his duty to protect the interest of the estate, and not to permit his personal interest to in anywise conflict with his duty in that respect. The intention is to provide against any possible selfish interest exercising an influence which can interfere with the faithful discharge of the duties which is owing in a fiduciary capacity. ... It makes no difference that the estate was not loser in the transaction, or that the commission [the trustee might have earned] was no more than the service were reasonably worth, it is the relation of the trust to the estate which prevents his dealing in such a way as to make a personal profit for himself. ... While no wrong was intended and none was in fact done to the estate, we think nonetheless that upon the principals governing the duty of a trustee, the contention that this profit could not be taken by [the trustee] owing to his relation to the estate, should have been sustained.[51]

And further it has been said, "the office of a Trustee is important to the community at large, and frequently most so to those least able to take care of themselves. It is one of confidence. The law regards the incumbent with jealous scrutiny, and frowns sternly at the slightest attempt to pervert his powers and duties for his own benefit."[52]

Nor have these concepts been eroded in more recent times. The Second Circuit Court of Appeals, in 1954, examined Indiana Law in stating that the

Directors of a business corporation act in a strict fiduciary capacity. Their office is a trust ... Directors of a corporation are its agents, and they are governed by the rules of law applicable to other agents, and as between themselves and their principal, the rules relating to honesty and fair dealing in the management of the affairs of their principal are applicable. They must not, in any degree, allow their official conduct to be swayed by their private interest, which must yield to official duty.

Absolute and most scrupulous good faith is the very essence of a director's obligation to his corporation. The first principal duty arising from his official relation is to act in all things of trust wholly for the benefit of his corporation.

The Court then expanded these observations of Indiana Law by saying "In Indiana, then, *as elsewhere*, the responsibility of the fiduciary is not limited to a proper regard for the tangible balance sheet assets of the corporation, but includes the dedication of his uncorrupted business judgment for the sole benefit of the corporation, in any dealings which may adversely affect it." [Emphasis added.][53]

In 1973 that Court adopted the view of a Delaware Court which stated that although corporate officers and directors are technically not Trustees (outside the bankruptcy context),

they stand in a fiduciary relation to the corporation and its stockholders ... The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest. The occasions for the determination of honesty, good faith and loyal conduct are many and varied, and no hard and fast rule can be formulated ... If an officer or director of a corporation, in violation of his duty as such, acquires gain or advantage for himself, the law charges the interest so acquired with a trust for the benefit of the corporation, at its election, while it

---

and reasonable ... he is not permitted on his own account to compete unfairly with the trust."
(The commentator was Austin W. Scott, author of *Scott on Trusts,* and he was assisted on the article by then-students Clement Haynsworth, Jr. and William Appleton Coolidge.)

**51.** *Magruder v. Drury,* 235 U.S. 106, 120, 35 S.Ct. 77, 82, 59 L.Ed. 151 (1914). See also *Weil v.*

*Neary,* 278 U.S. 160, 49 S.Ct. 144, 73 L.Ed. 243 (1929) and *Crites, Inc. v. Prudential Ins. Co.,* 322 U.S. 408, 64 S.Ct. 1075, 88 L.Ed. 1356 (1944).

**52.** *Union Pacific Railroad Co. v. Durant,* 95 U.S. 576, 578, 24 L.Ed. 391 (1877).

**53.** *Perlman v. Feldmann,* 219 F.2d 173, 175 (2d Cir.1955).

denies to the betrayer all benefit and profit." [54]

Recently, the Second Circuit Court of Appeals stated that a corporate board member has an obligation to the corporation and its shareholders of a "duty of loyalty," which derives from the prohibition against self-dealing that inheres in the fiduciary relationship. "Once a prima facie showing is made that directors have a self-interest in a particular corporate transaction, *the burden shifts* to them to demonstrate that the transaction is fair and serves the best interests of the corporation and its shareholders." [Emphasis added.] [55]

■ It is clear to the present Court that the duties which a principal would owe to stockholders of a public corporation are owed to creditors of a closely-held corporation that is a Chapter 11 Debtor-in-Possession. And it is clear that it need not be demonstrated that the fiduciaries did in fact harm their cestuis. (See the *Crites* case, discussed below.)

As will now be addressed, John Smith did not conform his conduct to the high standard of honor required of fiduciaries. He instead obtained an unfair advantage in favor of himself and Irene Smith in transactions involving the corporate Debtors-in-Possession.

■ It must be reiterated that this Court did not alienate the Smiths' interest in their lands or direct that it be done. The Smiths chose to do so. The above authorities are clear that where doing so might operate to the detriment of the corporation, John Smith's duty was to at least fully disclose to the corporate creditors all facts and circumstances regarding their dealings and intentions so that the creditors, as beneficiaries, could deal on even terms. Like any other agent, corporate officers and directors who wish to engage in a transaction which entwines their personal and their representative roles have the duty to make full disclosure to the principal, and in some instances obtain its consent. [56]

### (3) John Smith's Post–Petition Breach of Duty as a Post–Petition Fiduciary

The matters before the Court are illustrated by a hypothetical that *might not be* on "all fours" with the facts at Bar.

A corporation is in Chapter 11. It manufactures Widgets and it is for sale. The equipment is suitable only for the production of Widgets. The Widget patent and brand name is owned, however, by the corporation's principals. The corporate assets would be worth a great deal more to a bidder who also owns the Widget patent and name.

While some creditors and bidders are collectively trying to find out whether the principals will sell the Widget patent and name (and at what price), so that there might be competitive bidding for the manufacturing equipment, the principals single out one wealthy bidder and say, "Give us more than fair value for the patent and name now, and you'll make it up on the other end, since the other bidders for the corporate assets will drop out and you'll get those assets at a bargain." That deal is consummated.

Even if the patent and name were not developed at corporate expense, have the principals breached any fiduciary duties such that the Chapter 11 Court may set the transaction aside?

Bearing in mind that the fiduciary duties of corporate principals must be observed for the benefit of the corporate creditors when the corporation is insolvent or in Bankruptcy, the Court might hold as to the above hypothetical that fiduciary duties have been violated in four regards:

---

**54.** *Abbott Redmont Thinlite Corp. v. Redmont,* 475 F.2d 85, 88 (2d Cir.1973).

**55.** *Norlin Corp. v. Rooney, Pace, Inc.,* 744 F.2d 255, 264 (2d Cir.1984), the court citing New York Business Corporation Law § 713(a)(3) as well as New York State Case Law.

**56.** 3 Am.Jur.2d, Agency Sec. 228–231 and cases cited therein. See particularly the *Crites,* note 51.

1. The principals have usurped the corporation's opportunity to profit from their decision to offer their assets for sale.

2. They have violated the State Law duty of undivided loyalty, for they have placed personal gain ahead of the best interests of the Corporation (*Norlin v. Rooney*, 744 F.2d 255) and have interfered with corporate activity.

3. They have defaulted in their duty as principals of a Chapter 11 D–I–P, to assist in reorganization or liquidation and avoid subversion of the competitive bidding process.

4. They have kept the reorganization Court from making a proper allocation of value as between corporate and private assets, and may thereby have diverted the value of estate assets to themselves.

There is no convincing evidence in the present record that the Smiths are the cunning, unscrupulous fiduciaries of the above hypothetical. Rather, it appears that Mr. Smith is not fully literate and that Mrs. Smith is a homemaker and mother of many children. They have worked hard for 25 years or more in the trash hauling business, actually driving trucks and otherwise physically doing the work for much of the time. Mr. Smith has in his depositions frequently professed his desire to see all the creditors get paid in full.

Despite millions of dollars of business-related fines and other debt, the Smiths and their corporations might have had a sizeable positive net worth as of the date of the corporations' filings, so long as the corporations' interests and their interests were sold as one "package"—a vastly expanded, legal, sanitary-landfill.

That did not happen. The question of who is to blame is not before the Court. But the possibility that the Smiths are innocent victims of someone else is not yet

before this Court, and is not a proper basis for decision, for there is no suggestion that they suffered at the hands of the Trustee.[57]

For purposes of this decision the Smiths must be judged by the legal significance of their actions, regardless of the motivation or advice upon which they gave the signatures which resulted in such enormous injury to creditors.

John Smith has violated his duties in similar ways to the "sharp practices" in the Court's hypothetical. We now turn to this analysis.

### (i) Usurpation of corporate opportunity
#### (a) General discussion

Corporate officers and directors are impressed with a number of fiduciary duties. Among them is the general rule prohibiting a corporate officer or director from taking advantage of a corporate business opportunity for his own benefit. As a result, when an executive learns of an advantageous business opportunity that the corporation has the ability to pursue, then he may not place his interests ahead of the corporation by pursuing the opportunity in his own name. The fact that the corporation is not harmed is immaterial. Liability is imposed based on the unjust enrichment that accrues to the executive.

The test for determining whether an executive has violated this duty is not based on one discrete theory. Rather, as with other common law doctrines, courts have developed a number of separate tests in examining the transaction in question.

The first test is the "interest or expectancy" test. This test focuses on whether the corporation has some interest or expectancy in the opportunity presented. An example occurs when a corporation approaches the end of its office space lease

---

**57.** From approximately p. 204 to p. 230 of the transcript of the proceedings before the Hon. Beryl E. McGuire of this Court on April 16, 1992, John Smith responds to examination by counsel for WMNY, Inc. Smith paints a picture of promises broken either by certain attorneys with whom he dealt in the subject transactions or by certain bidders. These were breaches that he believed threatened his ability to provide for his family, and thus motivated his decisions despite (perhaps) knowing something of his fiduciary duties. It is suggested in that testimony that some offers were not communicated to him by attorneys, and that he may have been lied to by attorneys. The image, if true and correct in all its various implicit shades and hues, is an embarrassment to the legal profession.

818

and plans to renew it. An executive would be liable for usurping a corporate opportunity under the "interest or expectancy" test if he were to lease the space in his own name and foreclose the firm's opportunity to renew the lease [58]. This test tends to be the narrowest of the theories, as it allows an executive the latitude to take advantage of opportunities that are outside the range of the firm's activities.[59]

The second test used by courts to determine usurpation of corporate opportunity is the "line of business" test. Under this test, the courts examine whether the transaction at issue is related to the existing or prospective activities of the corporation. An example of its application is where a soft drink bottling executive secretly bought the assets of a bankrupt competitor [60]. Although broader than the "interest or expectancy" test, courts do not hold that all opportunities are within a corporation's line of business. Some relationship must be found between the opportunity and the corporation for the court to find that the "line of business" test has been met.[61]

A third test used by courts in examining the usurpation issue is the "fairness" test. This test is more amorphous then the previous tests, as courts look at the circumstances surrounding the transaction to determine whether the executive took unfair advantage of the corporation. Among the factors courts have examined are: whether the opportunity was presented to the executive in his individual or corporate capacity, whether the executive learned of the opportunity while acting for the corporation, whether corporate resources were used to exploit the opportunity, whether the opportunity is essential to the corporation, whether the executive fully disclosed the opportunity to the corporation, and whether both parties reasonably expected that such opportunities would belong to the corporation.

Finally, a few courts have combined the "line of business" and "fairness" test into a two-step analysis.[62] The rationale behind this approach is to give management a firmer foundation in guiding executive behavior. Accordingly, if the transaction in question is found to be within the corporation's "line of business", the analysis continues (using the factors set out above) to determine if it was "fair". This approach has been questioned by commentators for *not* adding clarity to the corporation's decision making process.[63]

As with any general prohibition, theories exist by which the executive may, without liability, take advantage of opportunities that are deemed corporate. Upon full disclosure of material facts, the corporation (by majority vote of disinterested shareholders or directors) may reject the opportunity, thereby allowing the executive to pursue it. This disclosure must occur prior to the executive's pursuit of the opportunity. In the alternative, the transaction may be ratified subsequent to the disclosure, but courts may subject it to closer scrutiny.[64]

A second defense against usurpation of corporate opportunity is the corporation's inability to take advantage of the opportunity for itself. This inability may stem from financial, practical or legal considerations. A firm may be barred by regulation from pressing an opportunity. Similarly, a corporation may be unable to pursue an opportunity because the offerer refuses to do business with the firm, or because it was previously turned down by the offerer.

**58.** *Pike's Peak v. Pfuntner,* 158 Mich. 412, 123 N.W. 19 (1909).

**59.** *Diedrick v. Helm,* 217 Minn. 483, 14 N.W.2d 913 (1944).

**60.** *Guth v. Loft, Inc.,* 23 Del.Ch. 255, 5 A.2d 503 (1939). The Court held that the purchase by the President of the assets of a bankrupt competitor was a usurpation of a corporate opportunity.

**61.** *Burg v. Horn,* 380 F.2d 897 (2d Cir.1967).

**62.** *Miller v. Miller,* 301 Minn. 207, 222 N.W.2d 71 (1974).

**63.** Solomon, Schwartz & Baumann, *Corporations—Law & Policy* 72 (2d Ed.1988).

**64.** *Farber v. Servan Land Co.,* 662 F.2d 371 (5th Cir.1981).

A corporations's lack of financial ability to exploit an opportunity is viewed reluctantly by courts as a defense. Indeed, not all courts will allow evidence on the issue. It is felt that allowing the defense discourages executives from putting their best efforts into the corporation. Indeed, the weaker the firm, the stronger the defense for a usurping executive. Further, courts feel that some method of financing can always be found, especially if the opportunity appears lucrative. Accordingly, in the jurisdictions that allow the defense, the corporation must be close to financial ruin.[65]

The remedy imposed by courts where a usurpation of corporate opportunity is found is the constructive trust. This allows any property acquired by the executive to be treated as if it belonged to the corporation. In addition, any profits earned by the executive from the usurpation will be awarded to the corporation.

The doctrine of usurpation of corporate opportunity has not remained static through the years. As in other areas of the common law, changing business methods have spawned new fact patterns for courts to consider. Rather than relying on a checklist of elements, courts have focused their analysis on determining whether a fiduciary has taken unfair advantage of its position to the detriment of the firm. Accordingly, a broad range of fact patterns exist where courts have found that a usurpation of corporate opportunity occurred.

One common fact pattern that emerges in reviewing usurpation cases involves corporations providing goods or services. In this scenario, the executive learns of an opportunity to provide goods or services that the corporation is able to supply. Rather than informing his firm of the opportunity, he steers it towards his own interests in direct competition with his own firm.[66] As a result, the firm is harmed by losing the chance to exploit a business venture.

Another fact pattern in which courts have found a usurpation of corporate opportunity, is that of an executive who solicits the active clients of his corporation for his personal benefit. In *American Loan Corp. v. California Commercial Corp.*, 211 Cal.App.2d 515, 27 Cal.Rptr. 243 (4th Dist.1963) a corporate officer was found to have usurped a corporate opportunity after taking a confidential client list from the firm. In related circumstances, (and relied on in the prior case) usurpation of corporate opportunity has been found in the theft and use of trade secrets by a corporate officer.

Real estate transactions involving the executive, the corporation and a third party provide additional illustrations of usurping a corporate opportunity. In these instances, an executive charged with renewing a lease or purchasing real estate for the corporation takes the property in his own name rather than in the firm's name. The corporation may be harmed in a number of ways: it may be forced to acquire a different parcel (or lease different space) at a higher cost, or in one case may have to vacate its offices after an executive renewed the corporate office lease in his own name.[67]

Similar to the cases involving real estate are cases where the executive purchases equipment that the corporation had planned to acquire.[68] In this manner the corporation is harmed as the ability to exploit a business ventures is impaired. The firm may be forced to pay more for the equipment, suffer delivery delays, or be unable to obtain the item.

In a similar vein that combines elements of the preceding two fact patterns, usurpation of corporate opportunity was found when corporate officers attempted to acquire an interest in oil, gas or mineral

**65.** *Klinicki v. Lundgren, Berlinair, Inc.*, 298 Or. 662, 695 P.2d 906 (1985). In addition, full disclosure must be made to the corporation.

**66.** *Central R. Signal Co. v. Longden*, 194 F.2d 310 (7th Cir.1952).

**67.** *Fayes, Inc. v. Kline*, 136 F.Supp. 871 (S.D.N.Y. 1955).

**68.** *Ellzey v. Fyr–Pruf*, 376 So.2d 1328 (Miss. 1979).

discoveries in direct competition with their firm. In *Alvest v. Superior Oil Corp.*, 398 P.2d 213 (Alaska 1965), the court found that executives breached their fiduciary duty by submitting applications for leases of oil and gas lands in their own name in addition to those submitted under the corporate name.

The usurpation of corporate opportunity doctrine has also been found in a wide range of stock transactions involving the executive and the corporation. The fact patterns include: the purchase by the executive of stock in his own corporation,[69] the purchase of stock in other corporations (thereby directly competing with this firm),[70] and the sale of an executive's own stock in the firm.[71] Courts have even applied the doctrine to insider trading cases, where the executive has profited from information gained from his position.[72]

Usurpation of corporate opportunity has also been found where executives have purchased the outstanding financial obligations of the corporation. Under this scenario, the executive is able to purchase corporate debts at a discount. Although the corporation may not be harmed, courts have found that officers have breached their duty to protect the interests of the firm's creditors.[73]

As is clear from the preceding cases, usurpation of corporate opportunity is not limited to one type of industry or transaction. Rather, the court is concerned with discovering whether a corporate officer breached his trust by taking something that rightly belonged to the corporation.

### (b) Application of the doctrine to the facts at Bar

■ In the case at Bar, a corporate opportunity was presented when the Smiths decided to make their interest in the lands titled in their name available for acquisition. It was usurped when the Smiths conveyed a leasehold for their own benefit without giving creditors an opportunity to meet their terms or to question the bona fides of their asserted interests. SSWS attempts to avoid this result in two ways: (1) It claims that the corporate opportunity doctrine cannot be implicated to compel corporate officers to commit their own assets to corporate use, and (2) it argues that OSL had no ability to take advantage of any opportunity in these regards.

■ As indicated earlier in this decision, the first argument is specious. No one is claiming in the present proceedings that the Smiths had a duty to commit their own interests for the debtors' benefit.[74] It was the Smiths' own choice to let their own interests. Having made that decision, it seems to the Court to be unarguable that John Smith (at least) should stand in no better stead by virtue of the fact that he already possessed title to the property, than he would stand if the property were still owned by the neighboring families from whom the lands were purchased (or if it were still owned by his wife)[75] and he

**69.** *Kelley v. 74 & 76 W. Tremont Ave. Corp.*, 3 N.Y.2d 973, 169 N.Y.S.2d 39, 146 N.E.2d 795 (1957). Officer usurped corporate opportunity in making secret deal with stockholder to purchase stock. Corporation had an interest in buying it's own shares.

**70.** *Borden v. Sinskey*, 530 F.2d 478 (3rd Cir. 1976). Corporate president found liable for usurping corporate opportunity by gaining controlling interest over banks, where corporation was formed with the intention of acquiring bank stock.

**71.** *Perlman v. Feldmann*, 219 F.2d 173 (2d Cir. 1955). Director breached corporate duty to minority shareholders and corporation by sale of controlling interest of firm's stock.

**72.** *Diamond v. Oreamuno*, 24 N.Y.2d 494, 301 N.Y.S.2d 78, 248 N.E.2d 910 (1969). Officers held liable in shareholders' derivative action for breach of fiduciary duty for trading corporate stock on material inside information.

**73.** *Brown v. Presbyterian Ministers Fund*, 484 F.2d 998 (3rd Cir.1973). Officers bought mortgage of insolvent corporation at discount.

**74.** Even though John Smith's pre-petition conduct has been found to manifest an agreement to share the profits of the sale of the land, the Court has not concluded on the present record that it could compel the Smiths to sell. See footnote 12, above.

**75.** In fact these properties were titled to his wife only, at the time of the commencement of the Chapter 11 cases. Although acquired jointly during the years 1982–1986, the lands had been conveyed by the Smiths jointly to Irene Smith

were attempting to buy those properties for resale for his own gain.

 It appears undeniable that those lands presented a true "opportunity" for the corporation, for landfill expansion. Moreover, the Smiths are estopped from claiming otherwise,[76] and John Smith should not be able to avoid the application of the corporation opportunity doctrine merely because he and his wife already own the lands, when the doctrine would clearly apply if they did not already own them and he acquired them to the exclusion of the corporation.[77]

 As to the alleged inability of the corporation to take advantage of the opportunity, this Court is prepared to hold, if required, that the existence of highly solvent bidders for the corporate assets, ready, willing and able (by means of the mechanisms afforded under Chapter 11 of the Bankruptcy Code) to provide all of the assets needed to take advantage of that corporate opportunity, conclusively rebuts that defense. It is not disputed that those bidders were extant. But even if those bidders did not exist, this Court agrees with the above authorities that hold that directors are not permitted to justify their conduct on the theory that the corporation is not able to undertake the venture; as quoted above, if directors were permitted to so justify their conduct, "there will be a temptation to refrain from exerting their strongest efforts on behalf of the corporation since, if it does not meet the obligations, an opportunity of profit will be open to them personally ... [One must question] whether a stronger effort might not have been made on the part of the management to procure for [the corporation] the necessary funds or credit."[78]

The Court thus holds that John Smith usurped a corporate opportunity when he decided to put his interests up for lease and "learned of" Irene's decision to do the same, but did not offer that opportunity to OSL and (by virtue of the Chapter 11 process) to its creditors and bidders.

### (ii) Other Breaches of Corporate Fiduciary Duties

It has been said that a Federal Court is bound to look to state rather than federal common law in issues involving the fiduciary duty of a corporate board of directors, and that the underlying fiduciary principles which constrain the actions of corporate officers and directors are found in state common law.[79] They have been set out as follows:

A Board Member's obligation to a corporation and its shareholders has two prongs, generally characterized as the duty of care and the duty of loyalty. The duty of care refers to the responsibility of a corporate fiduciary to exercise,

alone in 1990, presumably for estate planning reasons. SSWS, realizing that John might require personal bankruptcy and that said transfer might be challenged as a fraudulent transfer in John's bankruptcy case, had Irene transfer the land back to the two as wife and husband just before the two of them executed the lease to SSWS.

76. Causing or permitting OSL to expend substantial funds upon the Smiths' lands in developing them for future expanded landfill use should absolutely estop John Smith (at least) from claiming that acquiring the development rights to those lands was not a "corporate opportunity," even if the decision to capitalize the expenses upon the Smiths' land on the OSL books was not attributable to the Smiths. See *Graham v. Mimms,* 111 Ill.App.3d 751, 67 Ill. Dec. 313, 444 N.E.2d 549 (1982) holding that when a corporation's fiduciary uses corporate assets to develop a business opportunity, the fiduciary is estopped from denying that the re-sulting opportunity belongs to the corporation whose assets were misappropriated, that Court adding that this estoppel rule applies even if it was not feasible for the corporation to pursue the opportunity or even if the corporation has no expectancy in the project.

77. SSWS argues that the doctrine in question cannot apply to assets already owned by the fiduciary. The argument is hollow. The "opportunity" to be protected is the opportunity to *profit,* not the opportunity to *acquire.* While the Smiths could not be compelled, under the doctrine, to sell, they are not permitted to hold secret from the corporation the fact of their decision to sell, and thereby usurp the profits for themselves (and SSWS).

78. *Irving Trust Company v. Deutsch,* 73 F.2d 121, 124 (2d Cir.1934); *Perlman* at 177.

79. *Norlin* at 264.

in the performance of his tasks, the care that a reasonably prudent person in a similar position would use under similar circumstances. See NYBCL § 717. In evaluating a manager's compliance with the duty of care, New York Courts adhere to the business judgment rule, which "bars judicial inquiry into acts of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes."

The second restriction traditionally imposed, the duty of loyalty, derives from the prohibition against self-dealing that inheres in the fiduciary relationship ... once a prima facie showing is made that directors have a self-interest in a particular corporate transaction, the burden shifts to them to demonstrate the transaction is fair and serves the best interests of the corporation and its shareholders.[80]

That a Trustee will be permitted no profit out of his trust is almost too well-settled to require a statement of authority, but nonetheless requires some explanation here, in light of the actions of John Smith and SSWS. Thus, as quoted earlier the Supreme Court stated:

It is a well-settled rule that a trustee can make no profit out of his trust. The rule in such cases springs from his duty to protect the interest of the estate, and not to permit his personal interest to in anywise conflict with his duty in that respect. The intention is to provide against any possible selfish interest exercising an influence which can interfere with the faithful discharge of the duty which is owing in a fiduciary capacity ... it makes no difference that the estate was not a loser in the transaction.... It is the relation of the trustee to the estate which prevents his dealing in such a way as to make a personal profit for himself.[81]

And it also has been said:

A trustee must not compete with his beneficiary in the acquisition of property. The principal is not limited to cases where the fiduciary acquires property entrusted to him, nor to cases where the fiduciary completes with the beneficiary in the purchase of property which the trustee has undertaken to purchase for the beneficiary even though the interest purchased by the fiduciary for himself is not property of the beneficiary entrusted to the beneficiary, nor property which the fiduciary has undertaken to purchase for the beneficiary, the principle applies if the property purchased by the fiduciary for himself is so connected with the trust property or the scope of his duties as fiduciary, that it is improper to purchase it for himself.[82]

Must not the same be said as to a fiduciary who colludes with a bidder in a way that would drive down the value of the corporate assets and profit the fiduciary personally? "Equity tolerates in bankruptcy trustees no interest adverse to the trust. This not because such interests are always corrupt but because they are always corrupting," said Mr. Justice Jackson on behalf of the Supreme Court in *Mosser v. Darrow*, 341 U.S. 267, 71 S.Ct. 680, 95 L.Ed. 927 (1951), adding that "by its exclusion of trustee from any personal interest, **[equity] seeks to avoid such delicate inquiries as we have here into the conduct of its own appointees** by exacting from them forbearance of all opportunities to advance self-interest that might bring the disinterestedness of their administration into question." [Emphasis added.]

 We must recognize that John Smith was not a "disinterested" appointee of the Bankruptcy Court. He obviously possesses self-interest. We must also recognize that to an extent he is free to pursue that self-interest. What the Court holds is that *clearly and emphatically, he may not enter into a transaction "of*

---

80. *Id.* at 264. [Citations omitted.]

81. *Magruder*, 235 U.S. at 120, 35 S.Ct. at 82.

82. *Wootten v. Wootten*, 151 F.2d 147, 150 (10th Cir.1945).

*such a nature as to cripple or injure the corporation ...*" [83]. Yet he did so.

▪ What is critical to the proper performance of the duties undertaken by Smith are: (1) avoid doing damage to the corporation, and (2) when pursuing your own self-interest, make appropriate disclosure and seek consent.

"If dual interests are to be served, the disclosure to be effective must lay bare the truth, without ambiguity or reservation, in all its stark significance ... [That the fiduciaries acted in good faith] is no sufficient answer by a trustee forgetful of his duty. The law does not stop to inquire whether the contract or transaction was fair or unfair. It stops the inquiry when the relation is disclosed, and sets aside the transaction or refuses to enforce it, at the instance of the party whom the fiduciary undertook to represent, without undertaking to deal with the question of abstract justice in the particular case. Only by this uncompromising rigidity has the rule of undivided loyalty been maintained against disintegrating erosion."[84]

Most recently, the Second Circuit has stated (in the context of a broker as a trustee), that "based upon a ... position of trust, a [fiduciary] is under a duty to disclose to his principal all of the material information he has concerning the transaction involved ... [and] may not engage in the same transaction on his own behalf 'without full and frank disclosure' of his relation to the transaction to his principal." [85] Consequently, even if the transaction between the Smiths and SSWS would not affect the value of the corporate assets, John Smith's failure to disclose the details of the transaction before they entered into it violated his duty of loyalty to the corporations and the duty of fair dealing. Had he made appropriate disclosures, the creditors committee could have challenged those aspects of the transaction by which it might be alleged that the Smiths were acquiring or foreclosing an interest in the assets of OSL in violation of the trust,[86] or other aspects of the transaction.

The fact that the transaction did have a tendency to depress the value of the assets of OSL is even more damning. "Certainly, a conspiracy by a trustee and others to chill bidding at a sale of trust property is a breach by the trustee of his duty of good faith to the trust estate." [87] Surely John Smith's execution of an agreement which could cause such injury to the corporation was not consistent with his fiduciary responsibilities.

The undisputed facts establish, and the Court finds, that the execution of this lease by the Smiths constituted a violation of Mr. Smith's duty of loyalty to the corporate debtors and of fair dealing with those corporations, because he failed to make meaningful disclosure of his intentions and the details of the intended transaction prior to consummating it.

**83.** *Solimine v. Hollander,* 128 N.J.Eq. 228, 16 A.2d 203, 217 (1940).

**84.** *Wendt v. Fischer,* 243 N.Y. 439, 154 N.E. 303, 304 (1926) (Cardozo, J.) [Citations Omitted.] See also *Crites, Inc. v. Prudential Ins. Co.* 322 U.S. 408, 64 S.Ct. 1075, 88 L.Ed. 1356 (1944), a case with significant similarities to that at Bar.

**85.** *BAII Banking Corporation v. UPG,* 985 F.2d 685 (1993). See also *Brown v. Presbyterian Ministers Fund,* 484 F.2d 998 (3rd Cir.1973) in support of the proposition that even as to an officer, director and principal stockholder of a corporation operating under the protection of the Bankruptcy Laws, *disclosure* of opportunities available to the corporation to the trustee or receiver (if one has been appointed), or presumably to the creditors committee (if no trustee has been appointed), might satisfy the principal's fiduciary duty. *Brown* at 1005, and the text accompanying note 10 within that decision.

**86.** See 76 Am.Jur.2d, Trusts Sec. 216 and authorities cited therein. Under the lease, the Smiths were to receive $2 million if SSWS were to be the successful bidder for the assets of OSL, and would receive higher profit from royalties if SSWS were so successful. Might this be an acquisition of an interest in the trust property, in light of the belief that the Smiths could control the disposition of the OSL assets?

**87.** 76 Am.Jur.2d, Trusts Sec. 601, citing *Dickey v. Volker,* 321 Mo. 235, 11 S.W.2d 278 (1928). It is not surprising that more compelling authority for this proposition cannot be found; it appears to be too basic to have required statements by the higher courts.

824

*(iii) Breach Arising from Failure to Submit Allocation of Value to Bankruptcy Court*

█ Apart from Smith's fiduciary duties arising strictly from his relationship to the corporation, there is the question of his fiduciary duties as a controlling officer of a Chapter 11 Debtor-in-Possession. The nature of the duty has been discussed above. One of the breaches occurring here is his failure to submit to the Court the question of a fair allocation of the "synergistic" value as between his interests and those of OSL.

That OSL had a part interest in the profits or proceeds of an expanded landfill, and the fact that that contract interest was "property of the estate," has already been discussed. The same result obtains apart from "property" considerations, for OSL clearly had an interest in the enhanced "value" of the Smith lands. (And the opposite might well be true—the Smiths might have had an interest in any value enhancement of OSL lands attributable to proximity to Smith lands.) In electing to "allocate" that value secretly and for personal profit, Smith acted at odds with his duty to submit to the Court the extent of "property of the estate" and the value of the Debtors' assets.

' For this reason too, the lease must fail as against the estates.

### PART TWO–C. COMPLICITY OF SSWS

### (AND OF IRENE SMITH, IF SHE WAS NOT HERSELF A FIDUCIARY)

We now address the question of fairness to SSWS in assessing the appropriate remedy. In a case examined above,[88] the Supreme Court (per Mr. Justice Brandeis) found that a Trustee had breached fiduciary duty, and it held that "others who knowingly join a fiduciary in such an enterprise likewise become jointly and severally liable with him" for all the profits obtained by

him and by those who were associated with him in the matter: "Those who the Trustee deals with 'are held liable for knowingly confederating with one who, as receiver of the estate ..., owed a duty to it, and who put himself in a position where his personal interest conflicted with his duty.'" *Jackson* at 584.

This theme recurs throughout the cases of high authority. It was cited by the Second Circuit Court of Appeals in the case of *Irving Trust Company v. Deutsch*, 73 F.2d 121 (1934) wherein Judge Swan, speaking for the Court, stated that "one who knowingly joins the fiduciary in an enterprise where the personal interest of the latter is or may be antagonistic to his trust becomes jointly and severally liable with him for the profits of the enterprise." *Irving Trust* at 124.

In an early "insider trading" securities case, the Circuit said that "the general rule has always been that 'one who knowingly participates in or joins in an enterprise whereby a violation of a fiduciary obligation is effected is liable jointly and severally with the recreant fiduciary.'" And in the context of that case, the Court held that third-party co-venturers of corporate directors and officers who acted on inside information should not be permitted to escape liability to the corporation.[89]

Some courts have viewed the matter as being one of "civil conspiracy." Thus it has been said that persons who conspire with and induce directors to breach their fiduciary duties are liable for any damages which ensue. In one of these cases,[90] it was said that if a Trustee acts faithlessly and another aids him in such conduct to the end that they be benefitted through the corporate transaction, those who benefitted are liable for the damage. It is the failure to protect exclusively the interests of the corporation which is the breach and creates the liability; "the concerted activity to produce the breach of trust is sufficient sup-

**88.** *Jackson v. Smith,* 254 U.S. 586, 41 S.Ct. 200, 65 L.Ed. 418 (1921).

**89.** *Schein v. Chasen,* 478 F.2d 817, 822 (2nd Cir.1973).

**90.** *Penn–Texas Corporation v. Sarlie,* 15 Misc.2d 626, 181 N.Y.S.2d 750, 753 (Sup.Ct. Special Term N.Y. County 1958).

port for the allegation of conspiracy. And upon disclosure of the fraud, the corporation may recover the secret and guilty profit … [The corporation] is not … denied resort to the profit made through the acts of its faithless servant and his co-operator."

Another Court quoted *Scott on Trusts* for the proposition that where a person in a fiduciary relation to another violates his duty as fiduciary, a third person who participates in the violation is liable to the beneficiary and is chargeable as constructive trustee of the profit so made, unless he is a bona fide purchaser. The Court stated that New York law is in accord with this proposition, and that anyone who knowingly participates with a fiduciary in a breach of trust is liable for the full amount of the damage caused thereby to the cestui que trust.[91]

It seems clear, then, that just as it has been said that "a trusteeship is serious business and is not to be undertaken lightly or so discharged,"[92] it may be said that confederating with one in a violation of trust is serious business, as well. SSWS is charged with knowledge of the law.[93]

■ The sole remaining question in this regard is whether SSWS is chargeable with the type of complicity which would render it liable to the debtor corporations. "Liable" in this context has several implications. To the extent that the leasing of the Smith lands violated the automatic stay, did SSWS participate in a knowing violation thereof? Was it chargeable with knowledge that it could not acquire a leasehold interest to the exclusion of the debtor corporation's rights under the executory con-

tract to share in the profits or proceeds of the sale of the combined lands? Could SSWS be a "good faith transferee" for purposes of 11 U.S.C. § 550(d)?[94] Some of these questions cannot be answered until factual issues are resolved. For present purposes it need only be noted that there is no dispute regarding the fact that as a result of the "due diligence" performed by SSWS it was fully aware of the investments which OSL made upon the Smith lands, of the financial condition of the Smith-owned corporations, of the bankruptcy of those corporations, of the status of John Smith (at least) as a fiduciary, of the fact that SSWS's acquisition of a lease upon the Smith lands could devalue the assets of the corporations in bankruptcy, and that such lease would deny the debtor the opportunity to profit from the development of the expanded project. This is more than sufficient to deny SSWS any benefit of the lease as against the debtors' estates.

As to Mrs. Smith, the present record could support disparate findings, and therefore justifies none. These are Summary Judgment Motions, based only on bare affidavits, deposition transcripts and documents. No party or witnesses to the matters at hand have ever testified before this Judge of the Court. Many of the exhibits discussed at depositions have not been provided to the Court. Without the opportunity to assess the credibility of Mrs. Smith, Mr. Smith and other affiants and deponents and to consider other documents, the Court could assign Mrs. Smith's involvement to virtually any point along a spectrum. Her liability could range from that of an innocent participant in the lease transaction (at one extreme),[95] to knowing acquiescence in

---

**91.** *Pace v. Perk,* 81 A.D.2d 444, 440 N.Y.S.2d 710 (1981), citing *Wechsler v. Bowman,* 285 N.Y. 284, 34 N.E.2d 322 (1941), modified on other grounds, 286 N.Y. 582, 35 N.E.2d 930 (1941); and *Newburger, Loeb & Co. v. Gross,* 563 F.2d 1057 (2d Cir.1977), as well as *Cornale v. Stewart Stamping Corporation,* 129 N.Y.S.2d 808 (Sup.Ct 1954).

**92.** *Mosser,* 341 U.S. at 273, 71 S.Ct. at 683.

**93.** It might be noted that virtually every principle reiterated by the Court today was laid down by the highest Court of the Land and of this State decades ago. How these fundamental

concepts could have been ignored or "missed" escapes the Court.

**94.** This Court's earlier determination in another proceeding in this case, that SSWS was not a good faith lessee for purposes of 11 U.S.C. § 363(m), may not be collaterally attacked; it is, however, under appeal and will be resolved by higher authority.

**95.** It is undisputed that other than the last few weeks before the Chapter 11 filings, she had not worked regularly in the offices of the debtors since 1986. She had taken ill in that year (refer-

her husband's activities as, perhaps, her "agent" or "partner" with regard to "her" lands and knowing confederacy with her husband in his breaches of fiduciary duty (in the middle range),[96] to a level of knowing and intentional involvement identical in every way to that of her husband (at the other extreme).[97]

But the Court need not determine the extent of her involvement at this time, for even if it is assumed for the sake of argument that she is an innocent party to the lease, the lease cannot stand—SSWS may take nothing thereunder.[98] This result is dictated by the maxim, *"ex turpi contractu actio non oritur"*—"From an immoral or iniquitous contract an action does not arise."[99]

Thus the Supreme Court has said, in the bankruptcy context, that "Where a party seeks to enforce a contract and it is found to be invalid because contrary to public policy, the usual result is that the court dismisses the action and leaves the parties as it finds them."[100] This later led that Court to declare a fee-splitting arrangement among a bankruptcy receiver and attorneys for co-receivers to be "clearly unenforceable and void as against public policy."[101]

It has consequently been said that "Agreements where the object or tendency is to induce fraud or breach of trust on the part of one who stands in a fiduciary relation are illegal as being, in effect, agree-

ence is made to what John Smith called a "nervous breakdown") and also was busy taking care of fourteen children.

**96.** She knew that her husband was causing OSL to pursue a landfill expansion that involved the lands titled to her; that there were engineering and other costs involved and she "presumed" that OSL was paying those; that if the expansion permit was granted, then OSL was to operate the landfill upon those lands and she would collect rent; she was represented by counsel at the early hearings and consultations in this case at which representations were made on her behalf that led some creditors to believe that the type of activity here challenged would not occur.

**97.** She was the President of OSL at the time of the most recent minutes produced for that corporation—1982. (The Court notes that despite the duty of OSL's management to produce a list of officers and directors upon the request of a creditor pursuant to N.Y. Business Corporation Law Sec. 718, and despite the fact that OSL's annual state franchise tax returns probably contain that information, no such information has been provided and, moreover, **John and Irene Smith in their Answer claim to "lack information or knowledge sufficient" to form a belief as to whether they "are or were" officers, directors or persons in control of OSL.**) She was actively involved in management thereof on a daily basis until 1986. After that she admits being "sort of" a consultant to the company, doing route surveys and other projects. She and her husband clearly discussed some business matters (John says not the "major" matters, however) and she clearly was involved in consideration of the various pre- and post-petition negotiations regarding sale of the business and/or personal assets. John signed OSL's Statement of Affairs which said that as of August of 1991, Irene was the Managing Agent of

OSL; he testified at deposition on Sept. 10, 1991 that "She's the boss over me", in the debtor companies. He also has testified that she was compensated for the work she did for OSL, that at least as of the time of bankruptcy she was receiving $2000 per week from one of the companies, and that monies were freely transferred among the corporate entities so that bills would be paid from whatever company had the cash. (During the 9/10/91 deposition of her husband, Mrs. Smith, who happened to be there, offered some answers to questions her husband could not answer.)

**98.** This is a single lease of property titled to John and Irene Smith together as tenants by the entireties. Under New York law, unlike in many other States, one can acquire some leasehold rights in entireties property from only one of the spouses. See, e.g., *Colucci v. Zimmer*, 70 Misc.2d 609, 334 N.Y.S.2d 361 (Nassau Cnty. D.Ct.1972), and *Baker v. Westfall*, 30 Misc.2d 946, 219 N.Y.S.2d 328 (Montgomery Cnty. Ct.1961). SSWS is not currently asserting that it could acquire any interest in the subject lands from Irene Smith alone, but the Court deems it necessary to address this issue for present purposes.

**99.** Black's Law Dictionary, Sixth Ed. (West Pub. Co. 1990).

**100.** *Weil v. Neary*, 278 U.S. 160, 49 S.Ct. 144, 73 L.Ed. 243 (1929), the Court holding that a contract which violated a local rule of bankruptcy procedure which addressed "abuses which follow fraud and disloyalty by agents and trustees" was a "contract plainly illegal" and contrary to public policy.

**101.** *Crites, Inc. v. Prudential Ins. Co.*, 322 U.S. 408, 418, 64 S.Ct. 1075, 1081, 88 L.Ed. 1356 (1944).

ments to wrong or defraud the person whose interest the fiduciary has in charge." [102]

The fact that total nullification of the offending contract might injure innocent parties thereto is not ignored by these principles, for despite the fact that the contract might be treated as a nullity for certain purposes, and even innocent parties may not insist that the contract be consummated, they may be accorded a remedy in damages. [103] The Court's Order today will make provision for the possibility that Irene Smith might be entitled to damages as against SSWS, Inc. or her husband.

By virtue of their "due diligence" or otherwise, SSWS, Inc. knew or should have known that John Smith was under a disability to convey to them a "clear" leasehold, both by reason of OSL's rights protected by the Bankruptcy Code and by reason of his fiduciary duties as an officer of a corporate Debtor-in-Possession. For that reason alone, SSWS may take nothing under the lease. The Court, however, notes in passing that SSWS also knew or should have known that according to the last known corporate minutes, Mrs. Smith was the President of OSL and was possibly laboring under the same fiduciary obligations as her husband, at least as to post-petition transactions.

## PART THREE. OTHER ARGUMENTS AND MOTIONS

### PART THREE–A. REMEDIES

#### (1) The Requested Remedies

The Trustee asks that the lease between the Smiths and SSWS be declared void, so that the provisions of WMNY's bid that offered the Smiths essentially the same terms as SSWS's bid may be accepted by them and WMNY may develop the whole project. [104] The Smiths ask the Court to declare the "lease" to in fact be an "option to lease," which option continued until this Court determines that SSWS could or could not lease the Smith lands; by such construction the Smiths could keep the $30,000 per month "option payments" they have received for more than a year. Alternatively they ask that it be found to be contingent on Court approval.

First, the Smiths' arguments. An initial reaction to the argument that the lease is really an "option" might be to ask the Smiths why they didn't so assert in March and April of 1992 when this Court conducted ten days of hearings before another Judge (at one of which hearings John Smith testified) on the subject of whether SSWS was a good-faith bidder for the assets of OSL in light of the fact that SSWS claimed a *fait accompli* as to the Smith lands. Only now that SSWS's bid was rejected by the Court, and the Trustee commenced the present action, and the Smiths obtained new counsel, do the Smiths claim that they intended only an option all along and that, thus, no statutory or fiduciary duties were violated.

However attractive their requested remedy might appear (to everyone except SSWS), [105] and despite the fact that their now-asserted posture is fully consistent with the governing principles that the Court emphasizes today, the outcome required by law in light of the fact that

---

**102.** See 17A Am.Jur.2d, Contracts Sec. 289 and authorities cited therein.

**103.** Consider *Lowenschuss v. Kane*, 520 F.2d 255, 267 (2d Cir.1975), and see 17A Am.Jur.2d, Contracts Secs. 326–328 and authorities cited therein.

**104.** There is no possibility of restoring the *status quo ante* and re-auctioning the Debtors' assets. Emergency environmental concerns required immediate attention to the landfill. Only WMNY was willing to undertake that responsibility if SSWS was not permitted to acquire the OSL assets. WMNY's bid was approved by the Court and WMNY has been in possession; it has in fact obtained a permit for vertical expansion of the landfill.

**105.** A declaration that the lease is in fact an option that is subject to this Court's approval would take SSWS "out of the picture" except, possibly, as to damages, and would permit the Trustee to put WMNY in place as the lessee of the Smith lands; the Smiths would receive from WMNY essentially what they would have received from SSWS had SSWS been successful in acquiring the assets of OSL.

SSWS fully denies the Smiths' position is not nearly so "elegant."

The Smiths' argument fails in substance, as demonstrated by their own brief. Some quotes therefrom (with emphasis now added) illustrate the failings:

—"... courts rely on the intent of the *parties* and the merits and substance of a transaction, rather than the mechanical form of a transaction for purposes of constructing and interpreting agreements." (Smiths' Memo., p. 3.)

—"... when the literal meaning of contract language cannot reasonably have reflected the *parties'* contemplation, the language must be given its reasonable, rather than literal, application." (p. 6.)

—"... any *ambiguity* should be resolved in favor of the Smiths as landlord," since the lease was drafted by SSWS as tenant. (p. 7.)

As to the above quotes, SSWS vigorously denies any intention other than to lease. Furthermore, other than (1) the Smiths' current affidavits and (2) the fact that by its terms the lease is terminable at SSWS's will, there is no evidence offered to support a claim of intention to "option" the land, rather than to lease it. Additionally, the only "ambiguity" (if any at all) is in the rent schedule.

Still, the Smiths argue that—

—"... reasonable construction of the entire agreement is that the terms of the option give the right and option to SSWS ... to reserve the Smith Property for the future use and occupancy of SSWS as a month-to-month tenant until ..." certain specified events or dates. (pp. 8, 9.)

Such construction does not comport with the clear intentions of SSWS. One illustration of SSWS's intent is found at Trustee's Exhibit II—Copy of a 10/25/91 letter from counsel for SSWS to counsel for the Smiths. In that letter, faxed four days before execution of the lease, SSWS's counsel warns that the creditors of John Smith individually were considering an involuntary bankruptcy filing against John Smith, and that this Court might then enjoin the Smiths from disposing of any property. They said that that would "strip the Smiths

of any leverage or bargaining position which they may have had with creditors. We [SSWS's counsel] can foresee a situation in which *all* proceeds from the sale [sic] of the properties will go first to creditors." [Emphasis in original.] Any device such as an option that would require this Court's approval was not within SSWS's contemplation.

The Smiths also argue that if the lease is found to be a lease, then by virtue of certain language in the Schedule of Rents, the lease should be found to be contingent upon Court approval of SSWS's bid for the assets of OSL (which bid was rejected by the Court, from which decision SSWS has appealed). This argument would require that the Court ignore provisions of the lease that the Court is not persuaded to ignore. For example, according to the Smiths' argument, the Rent Schedule would specify the premises to be leased to the exclusion of Sec. 1 of the lease which defines the premises by metes and bounds; the Rent Schedule would provide the duration of the lease rather than "Sec. 3. Term"; and the Smiths' representations, warranties of title, etc., contained in Sec. 16 would have to be deemed a nullity, since their right to lease (or lack thereof) would be decided by this Court.

The Court rejects the Smiths' arguments.

The Trustee's request in essence asks the Court to declare that SSWS got nothing at all from the Smiths, but that the Smiths *may convey to WMNY* everything that the Court is saying that they *could not* convey to SSWS. It is hard to see how this Court could rule *on the present pleadings* that the Smiths may sell to WMNY that which they have previously sold to SSWS.

The difficulty here is twofold. First, as argued by SSWS in its Memorandum replying to the Smiths, SSWS may have stepped into the Smiths' shoes in some regards, if it wants to continue to pay the Smiths the rentals called for by the lease. Thus the Court cannot presume that the Smiths are at liberty to again convey their interests in their lands unless the Court were to void

(reform) the lease as between the Smiths and SSWS.

Second, the Trustee asks the Court to perpetuate the "estate" created by the lease; to wit, a 48–year leasehold interest under which the Smiths (or their successor and assigns) are the landlords. The very same post-petition lease that is the subject of this litigation, *created* a theretofore nonexistent 48–year leasehold estate in the "Smith lands." This Court holds today that that leasehold is not necessarily consistent with OSL's right to share in the profits or proceeds from a landfill on that property. After there is decision of all Causes of Action in this Adversary Proceeding (including findings as to Irene Smith), the Court might conclude that all the Smiths ever owned in these lands was bare legal title and no equitable interest; or it might conclude that the Smiths owned everything except the surface rights; or that OSL held a mere license upon the Smith lands, but that a 48–year leasehold tenancy should be viewed as *having been created* in favor of OSL by the Smiths' actions; or that a co-ownership was created such that the Trustee may sell even the Smiths' interests under section 362(h). A partnership between OSL and the Smiths might be found. Perhaps the Smiths had ownership, but a limitation of use existed in favor of OSL. And so forth.

Granting the Trustee or WMNY a "leasehold" is not necessarily the appropriate remedy. Remedies need not be defined by the wrongdoing or the wrongdoers.

### (2) The Remedies Now Ordered

That the debtors have a "legal or equitable interest" that was wrongly taken by the lease of the Smith lands has been established on these motions, and does not require trial. (At the least, it was a contract right to a share of the profits or proceeds from the combined lands.) It is also clear that restoration of the Debtors' interest requires that the lease not be recognized as precluding the debtor corporations from profiting from completion of the expansion project for the mutual benefit of the debtors and the Smiths (or their assigns).

Until all issues are resolved as to the respective interests, it is declared that the legal and equitable right to develop a landfill upon or in conjunction with the Smith lands rests (subject to State Law governing owners and operators of such sites) in the Trustee and his assigns, to the exclusion of the terms of the lease. The relative beneficial interests in the completed project await future decision, except that WMNY must be protected to the extent of its approved bid. Damages also must await future determination.

It is clear that the value of the Smiths' own claim upon their own rights in the Smith lands for the next 48 years cannot possibly exceed that which they bargained-for with SSWS and which value was essentially "matched" by WMNY. Thus, they or their assigns will be protected if whatever payments would otherwise be made to the Smiths under the terms of WMNY's bid are escrowed pending a determination of whether and the extent to which the various interested parties are entitled to them: the estates; the Smiths; SSWS.

### PART FOUR. ORDER TO BE SUBMITTED

Partial Summary Judgment is granted to the Trustee upon the Seventh and Eighth Causes of Action. The lease of the so-called "Smith lands" to SSWS, Inc. is void as against the Trustee of the estates of Orleans Sanitary Landfill, Inc. and affiliated companies. The executory contract between the Smiths and OSL to develop or market an expanded landfill is deemed assumed under 11 U.S.C. § 365. The allocation of profits, proceeds or losses thereof, as well as the matter of the measure and allocation of damages for violation of 11 U.S.C. § 362 and violation of fiduciary duty awaits resolution of the other Causes of Action and, where necessary, trial of disputed issues of fact. SSWS's Motion to Dismiss the Ninth Cause of Action need not be considered at this time (since a trial is required upon the same facts, but for different purposes), and is denied without prejudice. The Smiths' Motion to declare the lease an "option" or to declare the lease

to be contingent upon Court approval is denied.

Please settle the terms of an Order, or propose an Order on notice. Also, the parties shall contact Chambers and arrange for a further Scheduling Conference under Rule 16, F.R.Civ.P.

SO ORDERED.